## THE PRESIDENT POLK.

## THE PRESIDENT ADAMS.

### No. 360.

Circuit Court of Appeals, Second Circuit.

July 14, 1930.

See, also, 37 F.(2d) 102.

Forrest E. Single, of New York City (Robert E. Hill, of New York City, of counsel), for appellant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. De Grove Potter, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Stein, the libelant, shipped eighty bales of goat skins on the S. S. President Polk at Shanghai for New York. The steamer stowed them in her lower hold in which were

four of her fresh-water tanks. These had been nearly emptied when she reached Shanghai, and they were there drained, opened, cleaned and coated on the inside with cement, so as to be ready to receive fresh water at Hongkong, the next port of call. They had each two manholes, fitted with plates, all of which except two were properly set in place and made tight. These two both belonged to one tank; one was laid on top of it, the other was set in the manhole but not screwed down. When this tank was filled at Hongkong, the water escaped, ran aft, and injured the skins. Stein sued for the damage, but the District Court dismissed the libel, holding that since the ship had not meant to make the plates tight till she reached Hongkong, she was seaworthy at Shanghai, where the voyage began, and the fault was one of management.

As all the testimony was taken out of court we are in as good a position to decide upon the facts as the judge below. We think it clear that the Polk, when she broke ground at Shanghai, intended to sail with her fresh-water tanks sweet, clean and tight, and that she meant to fill them at Hongkong without further attention. The hold in question was at least half full of freight, probably two-thirds, and was to take no more cargo at Hongkong, though more was to be stowed in the 'tween decks above. The tanks were filled at Hongkong without any examination whatever; while of course this may have been due to negligence, it tends to show that they were supposed to be ready. Three of the four had their plates in place and tight; the one which leaked had one in place, though not tight. This effectually disposes of the argument that they had been left off to allow the cement to harden. All the tanks had been cemented; presumably all must be equally dry. If it be assumed that the one which leaked was the last to be cemented, both plates would have been left off for purposes of ventilation. To set one and not make it tight, and to leave the other on the tank top, was the one thing to demonstrate, not deliberation, but neglect. Furthermore, the leak was discovered only through the prying of a curious cooley who broached the hatch to the main hold and went below. Certainly if the engineer had understood that he was to leave off all the plates till he filled at Hongkong, he was a curiously shiftless officer. He was not called, nor was his absence accounted for, an omission which under the circumstances bears very heavily against the ship, for he was the officer in complete charge of this part of the ship's management.

Against this there is only the master's word that he had directed the engineer to leave off the covers till the ship reached Hongkong, when he was to reset them and fill. Ignoring the engineer's failure to confirm this, and his disregard of it as to three out of four of the tanks, the master's own report, made the very day of the accident, completely disposes of his testimony. In it he says that the engineer had gone down at Shanghai while the coolies were putting on the plates and "that he thought same were securely put on and made tight." He had not noticed "that anything was wrong with the manhole plates on the tank." Again, "these tanks being empty until we arrived here this morning, when the procedure of filling the tanks commenced about nine o'clock and the usual way of filling fresh water was done." It is impossible to add to the conclusiveness of this language. It is evident that the ship's officers supposed that all the plates were tight at Shanghai, meant to make them so and failed as to two, probably through the slackness of the supervision over the coolies by the local port staff.

In The Steel Navigator (C. C. A.) 23 F. (2d) 590, our main discussion was on the hypothesis that the officers supposed the manhole plates to have been finally set at Batavia. Even so we considered the ship not unseaworthy, because the fitness of the tank at Batavia was only for the latex, and the latex was cancelled at Singapore. As it did not appear that water would certainly be substituted for latex, we thought the failure at Batavia to make fast the plate could not affect her seaworthiness. If however the officers supposed the ship to be ready for the latex at Batavia and in fact she was not, she was in fact unfit at that port for her proposed voyage. Seaworthiness is a condition upon the excuse given by section three of the Harter Act (46 USCA § 192); the suit was not upon the breach of warranty, and the ship had therefore to be seaworthy in general. If the Steel Navigator was unseaworthy at Batavia, it is a little hard to see how the cancellation of the consignment at Singapore could affect that fact; the condition required by section three never existed. We now prefer therefore to rest that decision upon the fact that the officers did not intend finally to prepare the tank for latex at Batavia. In the case at bar, having found that the Polk got the tanks finally ready at Shanghai, and expected to do nothing more about them, their fitness at that port was the critical issue. They were concededly unfit, and the ship was unseaworthy. International

Navigation Co. v. Farr, 181 U. S. 218, 226, 227, 21 S. Ct. 591, 45 L. Ed. 830.

A second defense depends upon provisions in the bills of lading that "all claims  ⁕  ⁕  ⁕  for any loss of or damage to ⁕  ⁕  ⁕  merchandise  ⁕  ⁕  ⁕  shall be presented  ⁕  ⁕  ⁕  within ten days after discharge;  ⁕  ⁕  ⁕  and no suit on any such claim so presented or to recover for any such loss or damage shall be maintained unless summons or other process be served  ⁕  ⁕  ⁕ within thirty days from and after the day and .date that such claim be so presented." The injury to the bales was discovered on May 10, 1926, and an effort was at once made to separate the dry from the wet. The last, twenty-four in all, were reconditioned ashore, as best the claimant could, were forwarded upon another ship of the line, The President Adams, reached New York on July fifteenth, and were delivered on July twenty-second. Meanwhile the Polk had arrived in New York on July first, where. she delivered the supposedly sound skins, fifty-six bales, on July fifteenth. Either at the outturn or in conditioning it was, however, discovered that four of these had been wetted and were injured; this damage forms a part of the claim.

On May thirteenth the claimant wrote from Shanghai telling Stein of the injury to the twenty-four bales which were to be reconditioned and go forward on the Adams. Later it apparently advised him of the Polk's arrival on July first, in answer to which Stein wrote on July second that he trusted the separation of the dry from the wet bales at Shanghai had been successful, but that he doubted it, and that 'in view of the possible damage to the shipment now arriving, we wish to notify you that we will hold you responsible for any loss that may be found upon delivery to us, as well as any loss which may later be determined after the hides have been put through process." This was the only claim for "loss or damage"; the suit was started on October twenty-third.

■ The claimant argues, first, that a claim made before delivery does not satisfy the bill of lading, and, second, that the suit was not begun within thirty days after presentation of the claim. It does not suggest that the letter of July second was directed only to the skins arriving on the Polk. Literally this is true; Stein put forward no claim in that letter for damage to the skins on the Adams, which were still at sea. Yet the claimant is right not to press the point; it would be unreasonable to construe the claim of loss as limited to those of the fifty-six supposedly sound bales as to which the carrier turned out to be mistaken, while omitting the twenty-four on the Adams which both sides knew to have been injured. Though the letter did not mention these, it presupposed that any losses developing upon the others should be added to them. · This appears to us the inevitable implication of the correspondence.

■■ A much more serious objection is that the claim was made before the discharge of the Polk, and before even the arrival of the Adams. As to the fifty-six bales on the Polk such a claim was nearly useless; it merely told the carrier that the shipper would hold him for those bales which turned out to be injured. That did not help him to prepare his defence; it gave him no opportunity to examine the challenged goods while in his possession; it subjected him to exactly that unequal position in a consequent suit which he wished to avoid. The only exception is as to those whose injury could not be discovered within ten days of discharge; as to these the shipper could do no more than say that if any turned out bad, he would claim for them. It was as well to do this· before discharge as after. We think however that, assuming, as we have, the letter of July second to include the bales on the Adams, it was a good enough claim as to them, because the carrier needed no further advice except that the shipper would hold him liable. They were ascertained, laid aside and all the facts known about them. The mere assertion that the shipper meant to reclaim for the loss fulfilled every reasonable demand. Literally it is true the language of the bill of lading does not cover a claim made before delivery; "within ten days after discharge" would ordinarily forbid giving notice before discharge; but the carrier drew the bill and it seems to us that he should get nothing more than such protection as the purposes of the parties required. We hold therefore that the claim was good as to the twenty-four bales, but bad as to the four except as the injury to these could not have been discovered within ten days after discharge.

■ We agree with the District Court that the limitation of any suit to thirty days after the presentation of claim was unreasonably short. We have given our reasons in Cudahy v. Munson, etc., Co. (C. C. A.) 22 F.(2d) 898, for holding that as to notices of damage we would not adopt the analogy of the Interstate Commerce Act (49 USCA § 1 et seq.) a matter left open in Grace v. Panama R. R. · (C. C. A.) 12 F.(2d) 338. We need not de-

cide whether as to the limitation on suits we should adopt the doctrine of South & Central American, etc., Co. v. Panama R. R. Co., 237 N. Y. 287, 142 N. E. 666, which the Ninth Circuit has followed. Green Star S. S. Co. v. Nanyang Bros. (C. C. A.) 3 F.(2d) 369. Every one agrees that the limitation may be so short as to be unreasonable (The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419); thirty or forty days appears to us no more than a trap to get rid of inconvenient claims. The carrier needs no such protection; his defense is not imperilled, if he is not sued within a month. On the other hand, that is a very short period for the shipper to prepare suit, and to bring it perhaps many miles away. How short a limitation would be valid, whether a year or even six months, is another matter; the suit at bar was brought substantially within three months. Surely that was not an unreasonable delay.

Decree reversed; interlocutory decree directed for the libelant, except as to those of the four bales delivered on the Polk which appeared to have been injured within ten days after discharge.