## THE WEST KEBAR.

EDMOND WEIL, Inc., v. S. S. WEST KEBAR et al.

ROBERT SCHWARZ BRISTLE CORPORATION et al. v. SAME.

District Court, S. D. New York.

Nov. 18, 1943.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Thomas W. Geary, both of New York City, of counsel), for libelant.

Hunt, Hill & Betts, of New York City (John W. Crandall and Helen F. Tuohy, both of New York City, of counsel), for claimant-respondent and respondent.

HULBERT, District Judge.

These are two suits in admiralty, tried together, to recover cargo damages.

Libels were filed against the S/S West Kebar, her engines, etc., American West African Line, Inc., as owner, and Barber Steamship lines, as operating agents.

The libel in the first suit was filed January 28th, 1941, by Edmond Weil, Inc., and the subsequent libel was filed on January 14th, 1942, by Robert Schwarz Bristle Corp., Emil Buschoff & Co., Inc., N. Brezner & Co. Inc., William Hurwitz & Co., Ltd., S. B. Penick & Company, Gillespie & Company of New York, Inc., Cadbury Brothers, Ltd., Cadbury & Fry (ACCRA), Companie Francaise de L'Afrique Occidentel, John Holt & Company, Ltd., and John Menguissolou.

The claimant-respondents contend that the damage was caused by perils of the sea, and claim exemption from liability under the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. §§ 1300–1315.

Because of concessions of counsel, the court is concerned only with the responsibility for damage in the No. 4 and No. 5 'tween decks, the No. 4 and No. 5 lower holds, the port bunker and the shelter or bridge deck spaces.

### Findings of Fact

1. That libelants had, and have, the legal status set out in the respective libels; that the shipments therein described were laden in apparent good order and condition on board said vessel, a common carrier of merchandise by water, for hire, and all, or some part, of each shipment thus described (except piassava, Schwarz libel) sustained damage as the result of the entry of sea water during the homeward voyage, and the piassava sustained some damage through contact with sea water and/or palm oil; that the libelants were the respective owners of the cargoes described in said libels and were and are the proper parties to institute and maintain these suits.

2. The West Kebar was a well-deck ship of the three-island type having five holds; Nos. 1 and 2 on the forward deck; No. 3 amidship (shelter or bridge deck); and Nos. 4 and 5 on the after deck.

3. She was designed under the guidance of what was then the Emergency Fleet Corporation of the United States Shipping Board and built at Long Beach, California, in 1919–1920, under the supervision of the American Bureau of Shipping (hereinafter designated as ABS). Such supervision signifies that all materials of construction for hull, machinery and equipment were tested in the presence of surveyors of the ABS who were present during construction, supervised the work, and upon completion, their report was confirmed by the ABS who issued a certificate classifying the West Kebar "A–1" (first class). As the result of inspection at stated intervals thereafter, such classification was continued by the ABS until and including the commencement of the voyage involved in this suit.

4. The West Kebar was equipped as a coal burner, afterwards converted to oil. Some pipes came out through the engine room bulkhead and ran fore and aft on the after well deck on the port side of the coamings of Nos. 4 and 5 hatches to the poop deck; they were protected with 1/2 inch guard plates with the edges turned down. There were also pipes which led through the forward bulkhead on the bridge space into the open well deck.

5. There was a wiring system installed to furnish current for the navigation lights. Wires leading up from the dynamo or switch board in the engine room to the 'tween decks at the most convenient level under the deck corresponding to the circuit involved and then through the deck in conduit pipes, or "kick tubes" located near shrouds and the mast. This wiring system was discontinued early in the ship's life and each of the conduit pipes or "kick tubes" fitted with a screw cap, long before the vessel came under the ownership of the respondent. The vessel was equipped with goose-neck ventilators or cowls to supply the interior of the ship with fresh air, and led, among other places, into the shelter deck and the port bunker space.

6. The West Kebar sailed from New York on October 11, 1940, with a miscellaneous cargo. She discharged and loaded cargo at various West African ports and departed from Freetown on her west-bound voyage December 26, 1940 and encountered heavy weather on January 11, 12, 13 and part of the 14th, 1941.

7. Due diligence was used to make the West Kebar structurally sound when she broke ground at New York, and the storm which she encountered January 11th to 14th, attained catastrophic proportions and sea water entered the shelter deck or bridge deck space, the port coal bunker, the No. 4 and No. 5 'tween decks and the No. 4 and No. 5 lower holds, as a result of the storm, and damaged some cargo in all of said compartments.

8. On the after deck, the vessel carried 200 empty ammonia cylinders weighing about 200 pounds each, and a considerable number of mahogany curls—the root part of the tree—irregular in shape and of varying weights, from 200 to 1,000 pounds each. This cargo was properly stowed. It broke loose during the storm and snapped off several of the conduit pipes or "kick tubes" permitting water to enter the No. 4 and No. 5 'tween decks, some of which found its way into the No. 4 lower hold and, to a less degree, into the No. 5 lower hold. Sea water entered the shelter deck and bridge space through openings resulting from structural damage and from the shelter

deck, by reason of "old age of the leaky cement blocks in the frames", and probable working of the ship in the storm, into the port bunker.

9. There was a door with a 10-inch sill in the bulkhead, between the No. 4 'tween deck and the port bunker, so equipped that it could be dogged and made water tight. It was closed when the ship sailed from New York but was left open out of Lagos (December 9) or Cape Palmas (December 19) and so remained until arrival in New York on the return voyage, and water could and did flow over that sill from the No. 4 'tween deck into the port bunker.

10. At Lobito, on November 27–29, 1940, 1,100 tons of zinc ore, in bulk, was taken aboard; approximately one-half of this cargo was stowed in lower No. 2, and the other one-half in lower No. 4, holds. The ore was a fine powder and very heavy. The stowage in lower No. 4 was in the rear, on the bottom on both sides of the shaft alley from the wall to the wings or skin of the ship. At the forward or open end a wooden bulkhead 8 ft. high was constructed against which bundles of matte were stowed. This matte consisted of copper sheeting bent over to make a bale about 3 ft. wide and 3½ ft. long, and there were two bales placed one on top of the other. Between the skin of the ship and the limber boards nearest thereto, there were cement blocks between all the frames, and before the zinc ore was stowed, the cracks and holes in the limber boards and the cracks in the floor boards "if they were big cracks," were sealed up to stop any ore from getting into the bilges. The ore in lower hold No. 2 was similarly stowed.

11. The scuppers in the 'tween decks and holds were tested once between Duala and Luanda and again between Matadi and Lagos on the return voyage. The carpenter poured about 9 quarts of water in each scupper and the Chief Officer heard it gurgle and concluded the drainage system was clear. Before leaving the African Coast a test was also made of the scuppers leading from the shelter deck, but no test was made of the port bunker drain.

12. A list to port during the storm prompted an investigation to ascertain its cause. Holes were bored into the No. 4 port bulkhead and water flowed freely but had very little effect on the list to port. A hole was bored through the shaft tunnel into No. 5 port hold which appeared to be dry. In pumping all bilges, particularly on the port side to ascertain the cause of the list, no difficulty was experienced except with respect to No. 4.

13. After arrival at New York and discharge of cargo, upon inspection it was found that the after 5 sections of the No. 4 port bilge were level full of zinc ore and the rose box was buried solid. There was some zinc ore in the No. 4 starboard bilge which extended up for a distance of two inches on the rose box, although no water had entered the starboard side of the No. 4 hold.

### Discussion

Libelants contend:

█ (a) That the disused conduit pipes or "kick tubes" constituted a potential hazard, and, in that respect the vessel was unseaworthy.

It served no purpose to leave them where they were but their removal was never requested by the ABS or the United States Steamboat Inspection Service. The West Kebar carried similar deck cargoes of empty ammonia cylinders and mahogany curls on many voyages during the past 15 years, and while on one or two occasions the deck cargo unshipped in bad weather, and caused structural damage, any potential danger from these "kick tubes" was not brought to the notice of the vessel or her owners and hindsight cannot be substituted for foresight.

(b) The limber boards or dunnage in the lower No. 4 hold was not made "sift proof" before the zinc ore was loaded.

This is true and a considerable quantity of the zinc ore did find its way into and clog up approximately one-half of the No. 4 bilge and the rose box.

An entry on November 30, 1940, in the bridge log book reads: "Coast Crew trimming zinc ore #2 and 4 all day. #4 Rose boxes inspected by carpenter and Chief Mate—All free."

On December 4, 1940: "1:00 to 1:30— #5 bilges and rose boxes inspected—all free."

The bilge soundings recorded in the bridge log book are mystifying. They correspond substantially with the entries made by the carpenter in the bilge sounding book. He testified that he took soundings every day, but that during the storm there were some that he could not get. His explanation of the entries recorded on the days of the storm was that he made the entries

after the storm was over. While the entries as to the No. 5 port and starboard bilges vary from day to day, the recorded entry as to No. 4, port and starboard, A. M. and P. M. is zero from December 7th until January 15th, when 5 ft. of water is shown (A.M. and P.M.) and thereafter the recordings made are such as would be expected on a vessel in her condition after the storm.

Since the testimony is that all of the pumps responded except the No. 4 bilge, the conclusion seems irresistible that the zinc ore had begun to sift through soon after it was loaded, and the vessel was therefore unseaworthy in that respect, and this is borne out by the fact that there is no evidence of any similar difficulty with respect to the zinc ore stored in No. 2 lower hold.

(c) The testimony is that by reason of the manner in which the cargo was loaded in the port bunker, the door which swung in from the No. 4 'tween deck, could not be closed.

Libelants place much reliance on the failure to close this bulkhead door, citing International Navigation Company v. Farr & Bailey Manufacturing Company, 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830, wherein the ruling in Dobell & Co. v. Steamship Rossmore Co., (1895) 2 Q.B. 408, is discussed at length.

In the latter case it was held that when one of the ports, improperly caulked through the negligence of a competent ship's carpenter, enabled sea water to enter through this port and damage the cargo, the vessel was unseaworthy.

In the case at bar it is not believed that the open bulkhead door was the proximate cause of the sea water entering the port bunker. The water came from two sources, i. e., from the No. 4 'tween deck, through that open door and from the bridge or shelter deck, and the proximate cause which admitted the water to the No. 4 'tween deck and the shelter or bridge deck, was the storm.

It seems clear that the damage to the cargo in the shelter or bridge deck, and the No. 5 'tween deck and No. 5 lower hold, was due to perils of the sea, but the damage to the cargo in the port coal bunker, the No. 4 'tween deck and No. 4 lower hold "was caused, not by the entry of water, but by its accumulation" (The Empress of Russia, D.C., 1 F.Supp. 978, 980) be-cause of insufficient drainage due to improper stowage of the zinc ore in lower hold No. 4 and the inadequate testing of the scuppers and drainage system (The Cornelia, D.C., 15 F.2d 245, at pages 247, 248; The Empress of Russia, supra; The Emilia, D.C., 13 F.Supp. 7, 9), which sufficiently accounts for the failure of the pumps to respond.

### Conclusions of Law

1. The West Kebar is entitled to exoneration from any damage sustained to cargo in the shelter or bridge deck and the No. 5 'tween deck and the No. 5 lower hold.

2. The libelants who were owners of the cargo in the port bunker, the No. 4 'tween deck and the No. 4 lower hold, are entitled to recover damages.

3. Let the interlocutory decree to be entered appoint a Commissioner to assess the damages.

## THE WEST KEBAR.

District Court, S. D. New York.

Jan. 12, 1944.

