EDMOND WEIL, Inc., v. AMERICAN WEST AFRICAN LINE, Inc., et al.

No. 119.

Circuit Court of Appeals, Second Circuit.

Jan. 12, 1945.

John W. Crandall and Hunt, Hill & Betts, all of New York City (Helen F. Tuohy, of New York City, of counsel), for appellants.

Robert E. Hill and Hill, Rivkins & Middleton, all of New York City (Robert J. Andrews and Stanley S. Green, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

■ The respondents appeal from a decree in the admiralty, holding the ship, "West Kebar," liable for damage to a cargo, lifted in African ports in December, 1940, and discharged at Boston and New York in the following January. The judge held the ship for a part of the damage and excused her for the rest. Edmond Weil, Inc., v. SS "West Kebar," D.C., 53 F.Supp. 763. Since the libellants filed assignments of error, Rule 38(c), both parties have in effect appealed. The "West Kebar" was 427 feet long, of the "three well" type, with five holds: Nos. 1 and 2—'tween-decks and holds—forward of the engine-room; No. 3 over the engine-room; Nos. 4 and 5— 'tween-decks and holds—aft of the engine-room. All the sea water damage in suit was in Nos. 4 and 5—'tween-decks and holds—and in a "port bunker," to be later described. When on December 26, 1940, the ship cleared at her last port of call in Africa—Freetown, Sierra Leone—there were stowed on her after well deck 200 empty ammonia cylinders, weighing about 200 pounds each, and mahogany "curls" (the root of the tree), weighing from 200 to 1,000 pounds each. The stow was on both sides of the No. 5 hatch, the cylinders forward and the "curls" aft. The cylinders were stacked in pyramids about five feet high, lashed together by chains, taken up by turnbuckles; net slings were placed over them, and other chains were then stretched over the top and made fast at each side of the stow. The "curls," irregular in size, were fitted together as well as could be, and stowed to a height of about three and a half feet. They, too, were covered with net slings and secured by six chains on each side. The ship, although an oil burner, had port and starboard coal bunkers forward of the No. 4 'tween-deck. A water-tight door with a ten-inch sill led from the 'tween-deck to

the port bunker, but it was left open and was blocked by cargo when the ship broke ground at Freetown. Originally the electric wiring had been carried in conduit pipes; but the wiring had been removed, and the stumps of the old conduit pipes, called "kick tubes," which had not been removed, protruded about six inches above the after well deck. These were about one and a half inches in diameter, and had been capped so as to be water tight; there were eleven of them scattered about the deck. Some time before noon on January 11, during either a "strong" or a "whole" gale (No. 9 or 10 on the Beaufort Scale), while the vessel was taking seas over her starboard quarter, one of the ammonia cylinders in the starboard pack began to slip out, and not long afterwards a large part of the stow was adrift, followed by the "curls." The cylinders plunged about the deck, struck a number of "kick-tubes," and broke them off. These openings let sea water into the 'tween-decks in Nos. 4 and 5, whence it flowed over the hatch coamings into the lower holds, and over the sill of the open doorway into the port bunker.

A steward's storeroom had been made out of the enclosed shelter deck compartment; it was directly over the port bunker. It was formed by wooden bulkheads forward, aft, and inboard; but these did not hold back water; and all water which entered the enclosed shelter deck compartment anywhere would flow over the bottom of the store-room. Water did enter through two eight-inch "gooseneck" vents situated on the deck above, sometimes called the bridge deck, and part of this water leaked down into the port bunker through cement blocks set between the frames at the skin of the ship and at the well deck level.

The libellants asserted that the ship was unseaworthy because of the "kick-tubes," but the judge exonerated her for any damage caused by the water which entered after they had been knocked away, because "any potential danger" from them had never been "brought to the notice of the vessel." He did, however, hold her for the damage caused by the water which entered No. 4 'tween-deck and hold, because of some zinc concentrate in that hold, which he found to have been improperly stowed, and to have so clogged the scupper pipes that the bilges could not be pumped. We need not describe the stowage of this zinc for reasons which will appear.

██ The first question is whether the ship was unseaworthy. Arguendo, we will assume that the "kick-tubes" did not make her so if she had carried no deck cargo; and, perhaps also, even when she carried certain kinds of deck cargo. Indeed, we might go still further, and assume that she was seaworthy, just as she rode, for a summer voyage, for example in the Mediterranean. But she was to cross the Atlantic in January, ending in latitudes over 40°; and the question is whether, with the deck cargo she actually did carry and the "kick-tubes" in her deck, she was reasonably fitted for such a voyage. The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 191 U.S. 1, 9, 24 S. Ct. 1, 48 L.Ed. 65; Societa Anonima, etc. v. Federal Insurance Co., 2 Cir., 62 F.2d 769, 771; The Smyrna, 4 Cir., 62 F.2d 1048, 1050; The J. L. Luckenbach, 2 Cir., 65 F.2d 570, 572; The Galileo, 2 Cir., 54 F.2d 913, 914. The fact that the "kick-tubes" had caused no trouble in the past was relevant, but far from conclusive; it took only a minimum of foresight to perceive that they would stand up against very little violence. True, as they were placed on the deck, they were out of the way; set either close to the bulkhead, alongside the hatch coamings, or around the mast. It would take a direct hit to break them off; but it would not take a heavy hit, and each one, if broken, would open a hole over an inch in diameter directly into the 'tween-deck. An ammonia cylinder, weighing 200 pounds, free to plunge about on an open deck in a heavy seaway, was an engine before which such a fragile obstacle was no better than an eggshell. The safety of the cargo stowed below deck was therefore absolutely dependent upon the continued solidity of the pack; and, in the way the cylinders were made fast, that solidity depended upon each one's keeping its position in the pyramidal stack. As soon as one slipped out from between its fellows, the hold of the rest upon each other was lost, and all would inevitably escape. There were the nets, to be sure, but these did not go clear to the deck, and could not be expected to hold if they had, once the pack broke up.

██ The consequences of any such break being so great, the least care that could be demanded was that the cylinders should

be made fast against all but the most un-expected and "catastrophic" storms; and such care the ship did not in fact bestow as the event proved. During the watch be-tween 4 a. m. and 8 a. m. on January 11, the "West Kebar's" log records a wind force of 8 on the Beaufort Scale—39 to 46 miles—and for the watch from 8 a. m. to 12 M., "9-10." Nine is a "strong gale" —47 to 54 miles—; 10 is a "whole gale" 55 to 63 miles. Kimball, the expert of the Weather Bureau upon such matters, com-puted that, at noon on the 11th, the "West Kebar" was 300 miles from the storm centre. (The master put her further away.) The storm itself Kimball thought was "about 125 miles across, and the area of gales extending out from the center was about 700 miles"; so that at noon on the 11th, the ship was, so far as we can tell, only 50 miles inside the perimeter of the surrounding gales.

■ The ship's officers testified that the stow of ammonia cylinders began to give way before noon. The master said that "some of them broke adrift during the morning of the day." Courtney, the "jun-ior third officer" went off watch at noon on the 11th; he said that "there was four cylinders from the starboard deck load that had been torn from the stow. * * * On my way aft to my quarters why I could see that the stow was torn loose. * * * I saw that the seas had torn the stow adrift and four cylinders had appar-ently slipped out." The second officer swore: "As soon as she started shipping water some of the cylinders broke loose and washed around the deck. * * * In the forenoon, around noon time was the first I knew of." Later he said that this happened "in the forenoon; somewhere close to noon. That is the first I knew of it." It is true that Huntley, the chief officer, said that four cylinders had broken adrift by 4:30 in the afternoon, and that "about three hours before that" one of the cylinders "came out of the forward end": i. e., that it had slid out "not out more than six inches." We are confident that he was mistaken as to the lapse of time, and that he saw the single cylinder be-fore 1:30 p. m. As we have just said, Courtney saw the four already "torn loose" and "adrift" before he went off watch at noon, and that fixes the time beyond per-adventure. From all this it is plain that the stow began to carry away some time before noon on the morning of the 11th;

perhaps a considerable time. The situation in its entirety was therefore as follows: The deck cargo was such that if the pack once broke up, the cylinders would plunge and charge about the deck in all directions, to the utmost peril to any who might seek to make them fast again. If any of them struck the "kicktubes," they would in-evitably knock them off and open holes in the deck. While the ship was riding out a "strong gale" with a wind force of less than 50 miles an hour, taking the seas over her starboard quarter, one of the cylinders began to slip forward out of the pack; this loosened the hold of the others upon one another, so that four slipped out and began to roll about. These were followed by the rest, as the storm increased, until all were adrift and with them the "curls." (In this summary we have, indeed, adopted the alternative less favorable to the ship: i. e., that the pack broke while the storm was only at the lower intensity: No. 9. We have done this deliberately because of the well settled doctrine that a common carrier has the burden of proof to bring the loss within an exception. The Edwin I. Morrison, 153 U.S. 199, 211, 14 S.Ct. 823, 38 L.Ed. 688; Schnell v. The Vallescura, 293 U.S. 296, 306, 55 S.Ct. 194, 79 L.Ed. 373; Commercial Molasses Corporation v. New York Tank Barge Co., 314 U.S. 104, 109, 62 S.Ct. 156, 86 L.Ed. 89.

■ In the face of this sequence of events, we do not see what difference it makes whether the storm reached "catas-trophic" proportions on the 12th. After the four cylinders fell out, the rest of the stow would have broken adrift, if the wind had never gone beyond a "strong gale." Furthermore, it is plainly impossi-ble to say whether the added violence of the ship's rolling and plunging opened more holes in the deck than would have been opened, had the storm not grown worse. The case comes down to wheth-er a ship proves that she is well found for a winter Atlantic voyage, when her stow breaks apart under such conditions. We do not see how less can be asked of her upon such a voyage, than that she shall successfully meet such weather, for sure-ly gales—indeed even "whole gales"—are to be expected in such waters at such a season. We cannot therefore agree that "the damage to the cargo in the shelter or bridge deck, and the No. 5 'tween-deck and No. 5 lower hold was due to perils of the sea," as the judge found. On the

contrary, we are forced to conclude that the "West Kebar" is liable for the entry of all sea water that she shipped on the after well deck. Thus it becomes unnecessary to consider whether the zinc concentrate in No. 4 hold was ill or well stowed. If it was ill stowed, the ship was at double fault; if it was well stowed, nevertheless it was the water which carried zinc to the bilges, clogged the "rosebox," and put the pumps out of action. That was not so unexpected a consequence of the original entrance of the water as to limit liability to the damage that would have occurred, had the pumps been working. It is impossible ever to predict what damage water will do to a cargo once it enters in quantity; clearly in this case it was likely to carry the zinc powder to the bilges. Probably it would in any case have been impossible for the ship to show how much the clogging of the pumps added; but it would be irrelevant if she could.

 One or two items of damage still require separate consideration. As we have said, some water came into the store-room and from there leaked into the port bunker. Part of this entered through the "goosenecks" on the bridge deck; and that, as we understand the ship's construction, implies that she had shipped the water even on that deck. The libellants do not suggest, however, that the construction was faulty, or that the wooden plugs, which the officers drove into the "goosenecks," were not proper; and it seems scarcely fair to press the burden of proof so inexorably. If not, the seas which washed out the plugs were either too strong to be resisted by ordinary means, or the plugs were driven home improperly; in either event the ship would be excused. Nevertheless the excuse will not serve her for several reasons. The greater part of the water which entered the bunker came over the sill of the open doorway from No. 4 'tween-deck; and for that the ship is liable in any event. How she could distinguish between the damage caused by that water, and the damage caused by the water which came from the store-room, it is impossible to imagine. Yet that would be her duty. Schnell v. The Vallescura, supra (293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373). But, as in the case of the zinc concentrate, it would make no difference if she could so distinguish. If all the water that came in entered the store-room through the "goosenecks," whatever found its way thence to the bunker had to do so by leaking through the cement which sealed that deck at the wings; and—to put it most moderately—the ship did not prove the use of due diligence to make sure that this cement was in seaworthy condition. It was old and had not been kept in condition; at best, we know little about it.

 There remains some damage done by palm oil, stowed in a deep tank amidships, which leaked through the gasket that should have made a tight joint at the lid of the tank. The ship's explanation for this is that, when she neared Boston, it became necessary to heat the oil so that it could be discharged, and that when heated it expanded, and some of it forced its way between the lid and the gasket. This raises the question whether that was a fault of management or of improper stowage; i. e., whether the doctrine applies of International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 226, 21 S. Ct. 591, 45 L.Ed. 830, followed by us in The Steel Navigator, 2 Cir., 23 F.2d 590, and the President Polk, 2 Cir., 43 F.2d 695. If the officers knew that the deep tank had been stowed so full that the heating necessary to discharge it would force some of the oil through the gasket, or was likely to, the fault was one of management. They should have opened the lid and drawn off enough to allow what was left to be properly heated when the time came to discharge it. But if they did not know this; if they supposed that the deep tank had been properly stowed so that it could be discharged as it was—including the preliminary heating—then the fault was one of improper stowage and the ship is liable. The record does not show that the officers or crew knew that the deep tank was too full and that they were therefore at fault in heating the oil. Thus the ship failed to bring herself within any exception, and she is liable for the loss.

The decree is reversed, and the case remanded to the District Court for further proceedings, not inconsistent with the foregoing opinion. Costs to the libellants.