**STANDARD OIL CO. (N. J.) v. ANGLO– MEXICAN PETROLEUM CORP.**

**THE ESSO PROVIDENCE.**

**UNITED STATES v. ANGLO–MEXICAN PETROLEUM CORP.**

United States District Court
S. D. New York.
June 5, 1953.

the partnership by gift to themselves as trustees for the benefit of close relatives.

632

Kirlin, Campbell & Keating, New York City (Ira A. Campbell and Raymond T. Greene, New York City, of counsel), for libelant, Standard Oil Co. (N. J.).

J. Edward Lumbard, Jr., U. S. Atty., New York City (Gilbert S. Fleischer, New York City, of counsel), for libelant, United States of America.

Haight, Deming, Gardner, Poor & Havens, New York City (Charles S. Haight and Clifford B. Alterman, New York City, of counsel), for respondent.

MURPHY, District Judge.

These are two suits which arise out of the same facts.

The suit by United States of America, as requisition time charterer of the SS Esso Dover, is to recover from respondent, Anglo-Mexican Petroleum Corporation, the sum of $72,319.32, with interest thereon, alleged to be due as the freight for the Esso Dover for carrying, in March, 1945, a quantity of fuel oil and diesel oil from the port of Fortaleza, Brazil, to the port of Montevideo, Uruguay. The oil loaded aboard the Esso Dover at Fortaleza was the same oil which previously had been shipped by the respondent on the SS Esso Providence on an intended voyage of the latter vessel from the port of Caripito, Venezuela, on February 12, 1945, to the port of Montevideo. A few days after the Esso Providence departed from Caripito and Trinidad, she broke down at sea, and the vessel was towed into the port of Fortaleza, where the oil laden aboard the Esso Providence was transferred to the Esso Dover under an agreement made by and between the libelant United States of America, as requisition time charterer of both the Esso Providence and the Esso Dover, by Standard Oil Company (N. J.) as the owner of both vessels, and by respondent, Anglo-Mexican Petroleum Corporation, as the shipper of the oil originally loaded aboard the Esso Providence at Caripito and transferred to the Esso Dover at Fortaleza. Such agreement was reduced to writing and was incorporated in the tanker voyage charter party, dated New York; March 10, 1945, between the United States as the owner of the Esso Dover and respondent, Anglo-Mexican Petroleum Corporation.

The suit by Standard Oil Company (N. J.) is against respondent, Anglo-Mexican Petroleum Corporation, to recover the sum of $14,659.45 alleged to be due from the respondent to libelant Standard Oil Company as a contribution in general average incurred in connection with the towing of the Esso Providence from the place of her breakdown on the high seas to the port of Fortaleza, after she had broken down and became disabled when the shoe portion of the stern frame broke through a defective thermit weld which failed, necessitating the cutting away of the whole rudder assembly. The thermit weld which failed was made in 1938, as a repair of a previous fracture of the stern frame which was found when the vessel then dry-docked.

Clause 21 of the voyage charter of the Esso Providence provided:

"In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or otherwise, the cargo, shippers, consignees, or owners of the cargo shall contribute with the Owner in general average * * *".

By the Carriage of Goods by Sea Act, incorporated in the voyage charter (Clause 25), and by Clause 1(a) of the charter, libelant Standard Oil was obligated to have and maintain the vessel in every respect seaworthy and fitted for the voyage, so far as could be attained by the exercise of due diligence. It was not responsible for loss or damage arising or resulting from latent defects not discoverable by due diligence.

The obligation of the cargo owner to contribute in general average was conditioned upon the libelant Standard Oil having exercised such due diligence. Respondent denies that this was done.

The issue in the case is, therefore, whether the evidence shows that libelant Standard Oil exercised due diligence to place and maintain the Esso Providence in seaworthy condition for the voyage on which the accident happened. It is the same issue for both suits and accordingly they have been consolidated for trial.

The following are made by the court as Findings of Fact

1. The oil tanker SS Esso Providence, formerly named "Cerro Azul", was voyage chartered by its time charterer, the United States of America, libelant, to respondent, on February 7, 1945, to carry a cargo of diesel and fuel oil from one or more ports in the Caribbean and West Indies, including Colombia and Venezuela, to Montevideo, Uruguay. The vessel sailed with full cargo from Caripito, Venezuela, on February 12, 1945.

2. On February 19, while proceeding on her voyage off the coast of Brazil, the vessel's first assistant engineer, Richmond, who was on watch in the engine room, experienced a sudden shock which made a lot of noise and shook the engines. Vibration came along the shaft and felt as if the propeller had hit something; after a minute or so everything went back to normal. He made an entry in the engine log book which reads: "At 5:32 propeller struck submerged object,—immediately notified bridge." This was not the original entry which was changed by Richmond at the suggestion of the Master and Chief Engineer to "sound better," and which read originally "vessel hit submerged object at 5:32."

3. The vessel continued operation until the following day when at 1824 the engines were stopped upon discovery that the rudder stock canted to port and the steering engine jammed with rudder hard right. Upon notification to the United States Navy, the USS Rockaway was sent and arrived on February 22. A United States Naval boarding party inspected the rudder and reported the stern frame completely broken at the top. On arrival of the USS Chain, a Navy repair ship, on February 25, the damage was examined again, the rudder post cut away and the vessel assisted to the port of Fortaleza, Brazil, where it arrived on March 5.

4. Continuance of the voyage by the Esso Providence being no longer possible, its cargo was transferred to the SS Esso Dover, which carried it forward to Montevideo. Subsequently the Esso Providence was towed by tug from Fortaleza to Newport News for repairs.

5. The cause of the failure was a fracture in the forward thermit weld in the skeg of the stern frame of the Esso Providence, which weld had been made in November, 1938 at the Todd Galveston Dry Dock, Inc., Galveston, Texas.

6. The Esso Providence, then the SS Cerro Azul was drydocked for examination at the Todd yard on October 31, 1938, whereupon the stern frame was found to have cracked about midway of the skeg—one crack being about 7" long and the other 5" long, and 2½" deep. Examination was made by a surveyor to the American Bureau of Shipping, C. H. Cook, and an inspector of the Bureau of Marine Inspection

and Navigation of the Department of Commerce, Capt. A. S. Phelan, and Frank Cox, in charge of ship repairs for libelant Standard Oil. They were of the opinion that the bad section should be cut out and a new section inserted by means of two thermit welds.

7. The contract for the repair was given to Todd Galveston Dry Dock, Inc., which contracted for the furnishing of the thermit welding material and equipment and the supervision of the thermit welding process with Metal & Thermit Corporation. The American Bureau of Shipping made it a requirement of thermit welding that the Metal & Thermit Corporation supervise the jobs.

8. Cox had used the process under the supervision of the Metal & Thermit Corporation on 6 ships at the Todd Galveston Yard prior to 1938. The man who had charge of the work for the Thermit company was Louis Vock, who had had an extended experience with the process. The labor required in making the weld was furnished by the Todd company under the direction of C. A. Green, blacksmith foreman for 29 years, who had rendered similar service in the repair of at least 22 other ships.

9. The drawing made by the Todd company shows that the length of the new casting was 27³⁄₁₆″, leaving a space of 1⅜″ between the ends of the casting and the ends of the stern frame to which it was to be welded.

10. The vessel was undocked on November 2 while the new casting was being made by Hughes Tool Company of Houston, and was redocked on the morning of November 5. In preparation for the making of the forward weld, one of the first things done was to take a measurement of the skeg, called "tramming", so as to assure that the skeg would retain its original length when the weld was completed. Also, a screw jack and blocks were placed between the rudder post and the forward part of the stern frame to hold the rudder post in position during the repair. The cracked part was then cut out by an acetylene torch.

11. The surfaces of the two ends of the skeg were scaled down to bare metal and sand blasted under the supervision of Vock. The new casting was lifted into the space created by the removal of the cracked section. It was fastened in position by welding four metal strips about 3″ long to the new casting and the ends of the skeg.

12. Next the space between the forward end of the casting and the skeg was packed with wax, and a wax collar 7⅜″ wide, centered upon the wax in the space, was molded.

13. Then followed the construction of a steel molding box, approximately 3 ft. square and 2½ to 3 feet high, which entirely surrounded the wax and the ends of the skeg and the casting.

14. Through holes in both sides of the box near the bottom, pipes were inserted leading to the lower corners of the wax collar, which pipes were used to form openings through the molding material to the wax collar, called "heating gates", through which preheating flames were introduced into the space filled with wax, which flames had the effect of melting the wax and preheating the casting and the skeg. One pipe was 2″ in diameter and the other 1½″ and were so arranged that the inner end of the larger pipe overlapped the outer end of the smaller pipe so as to form a shoulder against which a steel plug, fitted inside the opening left by the larger pipe, might rest. Such plugs were inserted after the preheating, and were backed up with molding material before the pour was made, to prevent any molten metal running out through the heating gates.

15. Another pipe about 1½″ in diameter, called "pouring gate", was inserted in the molding box, extending from the upper end of the box to an opening in the heating gate close to the wax collar on the port side. The upper end of the pouring gate extended at least 6″ above the top of the wax collar to a point about 6″ directly below the bottom of the hereinafter described crucible, which was suspended above it. When the welding process was operating the molten steel poured from the crucible into the pouring gate and through

it to the heating gate and thence into the lower end of the space to be welded.

16. Two pipes, about 3″ in diameter and 6″ long, were inserted over the wax collar at the top of the box for the purpose of constituting vents, called "risers", through which any gases developed in the welding process could escape, as well as to provide for the escape of any excess thermit metal which was not used up in the welding of the ends of the casting and the skeg.

17. Following the placing of the pipes for the heating gates, the pouring gates and the risers, the space around the wax and the pipes was filled with a molding material furnished by Metal & Thermit Corporation, and packed tightly so as to maintain its form and preserve intact the openings produced by the pipes after they were withdrawn.

18. This being accomplished, the pipes were withdrawn at or after noon of November 5, and a kerosene torch was then used to make a flame which was injected through the heating gate on to the wax until it was melted and thence on to the steel ends of the casting and skeg to preheat them preparatory to the introduction of the molten thermit metal through the pouring gate. The first preheating commenced shortly after noon of November 5 and continued for a period of eight to ten hours to near midnight, by which time the casting and the skeg showed a cherry red to lemon color, indicating a temperature of about 1800 degrees.

19. A crucible was suspended about six inches over the top of the pouring gate. It was equipped with a tapping pin inserted in its lower end, the pin being surrounded by non-combustible material and used for the purpose of holding back the thermit metal in the crucible until the pouring was ready to proceed. The constituents of the thermit metal were manufactured and supplied in closed bags by Metal & Thermit Corporation, and were poured into the crucible immediately before the thermit process was started. The constituents were principally iron oxide and pulverized aluminum, and the chemical reaction was based on the affinity of aluminum and oxygen, the aluminum absorbing the oxygen in violent reaction when once brought to a proper temperature, thereby creating thermit steel.

20. When the operation was ready to start, a small amount of ignition powder, made of barium peroxide and aluminum bronze, was placed on top of the contents of the crucible and ignited by means of a red hot rod. Then followed a violent reaction between the aluminum and the oxide, resulting in the contents of the crucible being raised in 15 to 30 seconds to a temperature of between 4,500° and 5,000°, melting the contents of the crucible into thermit steel. The thermit steel, being heavier than aluminum oxide, went to the bottom of the crucible and the oxide slag floated on top.

21. Immediately thereafter, the tapping pin was forced upward into the bottom of the crucible, forming an opening through which the molten metal poured from the crucible into the top of the pouring gate, from which place it passed to the bottom of the space formed by the wax, and thence rose through the space between the casting and the skeg, melting and fusing the ends of the casting, filling the intervening space and the space that had been created by the melting of the wax collar. All of this took approximately 45 seconds.

22. The forward weld was poured near midnight, November 5. It was examined and accepted by Cook, Cox, Green and Vock on November 6. About midnight on this date the after weld was poured and it was allowed to cool until the morning of November 7 when it was inspected.

23. This forward thermit weld was defective in that it did not have any fusion with the parent metal in the area of the upper right and central portion of the weld totalling about 20 percent of the weld area.

24. The weld was also defective in that its thermit metal was excessively porous to the extent of about 30 percent of the thermit metal.

25. The weld also lacked tensile strength. It amounted to 46,000 lb. per square inch, as compared to 72,000 for the tensile strength of the base metal in the original stern frame, and 90,000 for the steel piece inserted in the stern frame. This insufficiency was caused by insufficient additions to the original thermit material of manganese, nickel, chrome, steel punchings as well as aluminum.

26. Approximately 415 lb. of thermit was used in the forward weld.

27. No vent holes were made in the wax used in filling the gap, so as to prevent cold air and kerosene from rushing in upon application of the heating torch.

28. After the making of the thermit weld in 1938, up to the time when the thermit weld broke, the Esso Providence had been in dry dock eleven times: April 17, 1939, at Galveston, Texas; October 25, 1939, at the same place; April 27, 1940, at the same place; December 6, 1940, at Algiers, Louisiana; July 16, 1941, at Baltimore, Maryland; April 13, 1942, at Newport News, Virginia; April 7, 1943, at New York; October 10, 1943, at Malta; December 19, 1943, at Gibraltar; February 25, 1944, at New York; and, after the shoe portion of the stern frame had broken at sea, April 20, 1945, at Newport News, Virginia.

29. Sometime between the drydocking of the SS Esso Providence in 1938, from November 6 of that year to February 25, 1944 a manual electric arc weld was deposited on the forward thermit weld collar on the upper right hand side and across the top.

### Discussion

■ The Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., incorporated in the voyage charter, governs foreign voyages such as the instant one. Unlike the Harter Act, 46 U.S.C.A. § 190 et seq., in that a contract for such exemption is required thereunder, this Act exempts losses from unseaworthiness unless caused by failure to use due diligence to make the vessel seaworthy. Spencer Kellogg & Sons, Inc., v. Great Lakes Transit Corp. (The Fred W. Sargent), D.C.E.D.Mich., 32 F. Supp. 520. Accordingly, the sole issue in this case is whether the evidence shows that libelant Standard Oil exercised due diligence to place and maintain the Esso Providence in seaworthy condition for the voyage on which the failure occurred. More specifically, the question is whether such libelant exercised due diligence in making both the thermit weld and the manual welding in the collar of the thermit weld, and in subsequent inspections with respect to such welds. The measure of due diligence under the Carriage of Goods by Sea Act involved here is no different from that under the earlier Harter Act. See The Bill, D.C.D.Md., 47 F.Supp. 969, 976.

We begin with the conceded fact that the forward thermit weld in the skeg made in 1938 was defective. This is established by uncontradicted evidence of more than merely the failure of that weld in February, 1945, and the fact that such welds almost always endure as long or longer than the parent metal of the stern frame although the instant one survived slightly more than six years. It is also an uncontradicted fact that a non-fused area, to the extent of over 20 percent of the total area of the weld, existed in the way of the weld on the starboard side of the skeg, and that this non-fused area shortened the life of the stern frame. In addition, it is conceded that there was excessive porosity.

Conceivably there are three ways in which the measure of due diligence might be applied to the facts in this case. By the standard of strict liability without fault, with the superior perspective of hindsight and the deliberative advantage of afterthought, evidence of a defective weld might well be sufficient to establish lack of due diligence on the part of the shipowner. Such standard indeed is not foreign to admiralty, and is often the measure of unseaworthiness. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099; Kean v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515, 518; Jones v. Lykes Bros. S.S. Co., D.C. S.D.N.Y., 108 F.Supp. 323, 325–326. But

clearly, wisdom born of the event cannot be the measure of due diligence, and the standard must be one of conduct rather than of consequences. At the other extreme, is the subjective standard of the honest though mistaken belief in good faith by the shipowner that no damage will result. Such individual gauge may suffice to relieve a conscience of moral blame, but not a pocketbook of liability for damage.

■ Between these poles is a standard external to the notions of the shipowner of what is proper and yet based upon conduct judged in the light of probabilities apparent to the shipowner at the time of welding or inspection rather than those perceptible only by backward glance. Under this standard the probability of damage ought to be sufficiently high to command general attention. And risk of that damage must be estimated in the light of knowledge which the shipowner had and ought to have had. What knowledge the shipowner had is simply a question of fact; what knowledge he ought to have had is one of value determined by law. The minimum knowledge that ought to be had by one without special training is (1) what would be apparent to most men of ordinary intelligence and experience who make use of their faculties; and (2) what would be discovered by the kind of investigation that a man of reasonable prudence would make. In addition to these, a shipowner with special training ought to know (1) what would be apparent to most men with such special training; and (2) what would be discovered by the kind of investigation that they would make in the exercise of reasonable prudence. Cf. Holmes, J., in Commonwealth v. Pierce, 138 Mass. 165, 179; The Germanic, 196 U.S. 589, 595–596, 25 S.Ct. 317, 49 L.Ed. 610; The Common Law 44–57.

■ This external standard of due diligence is the one applied more or less explicitly in cases arising under the Harter and Carriage of Goods by Sea Acts, subject to a few important modifications in the direction of strict liability without fault. One of these is that the burden of proof of the exception of due diligence to the war-

ranty of seaworthiness is upon the carrier. 46 U.S.C.A. § 1304(1); The Southwark, 191 U.S. 1, 13, 24 S.Ct. 1, 48 L.Ed. 65; Ore Steamship Corp. v. D/S A/S Hassel, 2 Cir., 137 F.2d 326, 329; Edmond Weil, Inc., v. American West African Line, 2 Cir., 147 F. 2d 363, 366. Another is that the duty of the carrier to exercise due diligence is not delegable to others. Ore Steamship Co. v. D/S A/S Hassel, supra, 137 F.2d 326, 330; Bethlehem Shipbuilding Corp. v. Joseph Gutradt Co., 9 Cir., 10 F.2d 769, 771. Indeed the exception of due diligence is one strictly construed against the carrier warranting a seaworthy vessel. Compagnie Maritime Francaise v. Meyer, 9 Cir., 248 F. 881, 886. As Hand, L., Ct. J. observed in Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 783, "the warranty of seaworthiness is a favorite of the admiralty and exceptions to it or limitations upon it, are narrowly scrutinized."

Respondent has suggested by expert and other evidence several departures from exercise of due diligence in making the forward thermit weld, and libelant Standard Oil has sharply disputed whether these in fact took place with similar evidence: (1) There was a "short pour" of thermit of 425 lb. when the correct amount according to respondent should have been from 600 to 625 lb. Libelant insists that the gap measurements for the weld called for about 415 lb. and so the amount used was abundantly sufficient. (2) Respondent urges that it was not possible for the persons supervising the weld to observe the slag basin to ascertain whether the thermit went down the pouring gate and up the risers, but the testimony for the libelant of one such person is that he could and did make such observation. (3) Similar conflict is found with respect to whether the base metal was preheated to a cherry red color when the thermit metal was poured, as prescribed, or to a lemon yellow color which is some 500 degrees hotter.

Additional departure from allegedly safe practices in making thermit welds are admitted by libelant who disputes whether these could in fact have contributed to the fracture. (1) The failure to make vent

holes in the wax used in filling the gap is claimed by respondent to have caused the wax to be burned out in such a manner when the heating torch was applied as to cause cold air and kerosene to rush in and destroy parts of the mold. This effect is sharply denied by libelant. (2) Concededly some of the hoses ordinarily used for preheating in the shipyard were in defective condition, but libelant points out that there was no evidence that such hoses were actually employed in making the thermit weld on the SS Esso Providence.

The most serious point of agreement among the parties concerns first, the lack of tensility of the thermit actually used in making the weld, and second, the presence of manual welding on the collar of the thermit weld. With respect to tensility of the thermit weld, it is undisputed that it amounted to 46,000 pounds per square inch as compared with 72,000 for the base metal of the original stern frame and 90,000 for the insert piece. This deficiency was due, according to respondents, to insufficient additions to pure thermit material (which by itself has tensility of 45,000) in the form of manganese, nickel, chrome and steel punchings. Libelant admits such insufficiency and in addition that of aluminum. Indeed libelant insists that the deficiency of aluminum in the original mixture caused the thermit metal to enter the mold cavity at lower than normal temperature with higher oxygen content. Thus lack of fusion occurred in the upper right hand corner, as well as excessive porosity throughout, because the thermit metal had cooled off to such an extent that it did not melt the surface of the base metal over this area. But it is contended that such defects were latent and not discoverable by exercise of due diligence because the thermit material was furnished in closed bags by the Metal & Thermit Corporation, the manufacturer, upon whose high standing Standard Oil might with due diligence rely without necessity of having every bag of material analyzed before using.

It may be questioned whether *every* such bag would have had to be opened and analyzed to discover so marked a deficiency. There "must be due diligence in the work itself, and not merely in the selection of agents to do the work; otherwise, shipowners might escape all responsibility merely by selecting agents of good reputation, and would be relieved whether such agents exercised due care or not to make their vessel seaworthy, and any responsibility would be frittered away." Nord-Deutscher Lloyd v. President, etc., of Insurance Co. of North America, 4 Cir., 110 F. 420, 427. It may also be questioned whether such explanation sustains the shipowner's burden of proof of due diligence, which includes "the burden of showing that the latent defect was not discoverable." Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687, 691.

But apart from the defect of tensility, was the conceded presence of manual welding on the upper right hand side and across the top of the collar of the forward thermit weld, possibly amounting to as much as twenty inches. Respondent insists that this was deposited on the collar in 1938 to cover up a shortage of thermit metal. Libelant claims that it was deposited in 1941 to correct surface erosion. There is no direct evidence whatsoever as to the time and circumstances of its deposit. There was evidence that the manual weld had been deposited on porosity areas and on slag without there having been any chipping down to good metal, and that the fracture occurred through a bead of the manual weld. It was consequently important to establish whether the manual welding had been performed with due diligence. In addition, it was even more important to establish why the manual weld was deposited on the collar of the thermit one. If it were done merely to correct some slight surface erosion on the occasion of drydocking subsequent to 1938, then it might have little significance in pointing to the shipowner's lack of due diligence. But if the manual welding took place coincident with the thermit weld in 1938, or subsequent to 1938 under circumstances evidencing a defect in the thermit weld, then clearly the shipowner would be under a duty to investigate more thoroughly the nature of the thermit weld so that its inherent defects could be laid bare. Such investigation certainly would

be required by the external standard of due diligence discussed above.

"But whether fault can be affirmatively established in this respect it is not necessary to determine. The burden was upon the owner to show by making proper and reasonable tests that the vessel was seaworthy and in a fit condition to receive and transport the cargo undertaken to be carried, and if by the failure to adopt such tests and to furnish such proofs the question of the ship's efficiency is left in doubt, that doubt must be resolved against the shipowner and in favor of the shipper." The Southwark, 191 U.S. 1, 13, 24 S.Ct. 1, 48 L.Ed. 65. Of course, obtaining seaworthy certificates does not resolve such doubt. Bank Line Ltd. v. Porter, 4 Cir., 25 F.2d 843, 845, certiorari denied 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544; Compagnie Maritime Francaise v. Meyer, 9 Cir., 248 F. 881, 885. Nor does subsequent investigation of some sort, insufficient to disclose the defect, meet the requirement of due diligence, when a more searching investigation might have done so under the circumstances. Erie & St. Lawrence Corp. v. Barnes-Ames Co., D. C.W.D.N.Y., 52 F.2d 217, 219; Ore Steamship Corp. v. D/S A/S Hassel, supra, 137 F.2d 326, 329; Huilever, S.A. Div., Huileries Du Congo Belge v. The Otho, 2 Cir., 139 F. 2d 748, 750.

We must conclude then, in this posture of the evidence, in the words of the Supreme Court, The Southwark, supra, 191 U.S. 1, 15, 24 S.Ct. 1, 6, "the vessel owner has not sustained the burden cast upon him to establish the fact that he has used due diligence to furnish a seaworthy vessel, and, between him and the shipper, must bear the loss."

### Conclusions of Law

1. This court has jurisdiction of the subject matter and the parties.

2. Libelant Standard Oil Company (N. J.) has not sustained the burden cast upon it to establish the fact that it had used due diligence to furnish a seaworthy vessel.

3. The libels are accordingly dismissed.