## UNITED STATES v. CHARBONNIER et al.
### (two cases).

### THE PINELLAS.

#### Nos. 2962, 2963.

Circuit Court of Appeals, Fourth Circuit.

Oct. 29, 1930.

Roscoe H. Hupper, Sp. Asst. to Atty. Gen. (J. D. Ernest Meyer, U. S. Atty., of Charleston, S. C., Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, and H. H. Rumble, Sp. Assts. to Atty. Gen., on the brief), for appellant.

T. Catesby Jones, of New York City (Bigham, Englar, Jones & Houston, of New York City, Huger, Wilbur, Miller & Mouzon and Alfred Huger, all of Charleston, S. C., and W. J. Nunnally, Jr., of New York City, on the brief), for appellees.

Before NORTHCOTT, Circuit Judge, and BAKER and SOPER, District Judges.

SOPER, District Judge.

The exhaustive and painstaking opinion of the District Judge in these cases contains the following statement which correctly sets out the issues and salient facts involved in the controversy:

"These two suits arise out of a fire which happened on the [United States] Shipping Board steamer Pinellas at Charleston on the night of June 15, 1921, whereby her cargo of cotton was damaged by fire and by water used to extinguish the fire. The first suit is brought under the Suits in Admiralty Act (46 USCA §§ 741–752) by the owners of the cargo to recover from the United States the cargo damages. The second suit is a cross-libel brought by the United States against the cargo owners to recover salvage and general average contribution in respect to the sacrifices and expenses necessitated in the saving of the ship and cargo. * * *

"For convenience, the libelants will hereafter be referred to as the cargo owners, and the respondent and cross-libelant as the shipowner.

"To state the issues very briefly, the shipowner claims that inasmuch as the loss to the cargo occurred from fire, he is exempt from liability by virtue of the Fire Act, R. S. § 4282 (U. S. Code, title 46, § 182 [46 USCA § 182]); and that having exercised due diligence, under section 3 of the Harter Act (U. S. Code, title 46, § 192 [46 USCA § 192]), he is not responsible for damages from faults or errors in navigation or the management of the vessel. The shipowner also contends that by virtue of the 'Jason Clause' in the bills of lading, he is entitled to salvage and general average contribution. The cargo owners claim that the fire was caused by neglect of the shipowner; that there was a deviation and the shipowner thereby became an insurer of the cargo. They also claim that because of the deviation and unseaworthiness of the ship, there is no liability for salvage and general average contribution. * * *

"The Pinellas was built in 1920 by the Merrill-Stephens Shipbuilding Company, at Jacksonville, under the inspection of the American Bureau of Shipping, and was by that Bureau classed as 'A1.' At the time of the losses under consideration, she was operated for the Shipping Board by the Carolina Company, a corporation. She was an oil-burning steamship of the Submarine Boat Corporation type, of 3,850 tons gross. For the storage of her oil, she was equipped with certain tanks and among them what was called the 'deep tank.' This tank was divided into two compartments, and into each compartment led a fueling pipe line and from each led a vent pipe line. * * *

"Before the Pinellas entered upon the voyage which resulted in the fire, she had been laid up, but was put into service again at Savannah; and when her master joined her, she had no crew, the only person aboard being the watchman. Her cargo for the voyage was to consist of cotton and cotton-seed meal; and the bills of lading gave her the right to proceed to other ports to complete loading. The plan was to take on board cotton and cotton-seed meal at Savannah, proceed to Charleston and take on cotton there sufficient, to complete the cargo, and then make the voyage to Liverpool. The bills of lading called for a voyage from Savannah to Liverpool, but with the privilege above mentioned. While loading at Savannah, a strike occurred and all the engineers left the ship, and she finished taking on the cargo at Savannah with no engineers aboard. All of her cargo was loaded at Savannah except, 1,500 bales of cotton, which was later loaded at Charleston. As the ship had no power of her own, the owner arranged to have her towed from Savannah to Charleston by the tugboat Christabel. She left Savannah on May 31, 1921, in tow by the Christabel. She had a full crew with the exception of engineers. * * * The Christabel succeeded in getting the ship into Charleston, where she was placed in a berth to take on her Charleston cargo. She there took on the 1,500 remaining bales, the loading being completed on June 3, 1921, and she was then towed to an anchorage in the Cooper river, and remained there at anchorage till June 15, 1921."

The events immediately preceding the fire and the causes thereof are stated substantially as follows in the District Court's opinion, which we find in accordance with the facts: About June 12, the strike ended and the owners were able to obtain an engineer crew, consisting of a chief engineer and three assistant engineers. The chief engineer had a license for vessels under 4,000 tons, but had never acted in such capacity on a vessel of the size of the Pinellas.. The first assistant engineer was his son, but held only a third assistant's license. These two came on board the ship on the morning of June 13th. The second assistant joined on June 14.

The fuel oil capacity of the Pinellas was about 8,200 barrels. On the afternoon of June 15th she was towed to the Standard Oil dock on the Cooper river for refueling. There was some dispute in the testimony as to the amount of oil which she then had on board, but the answers of the shipowner to the interrogatories and the records of the Carolina Company, the operator of the ship, show that the amount was 1,500 barrels. The chief engineer, however, testified that the amount of fuel on board was not over 6 tons and that this had been consumed in the pumping out of the ship on the night before the fueling operation took place. Consequently it is clear that the engineers did not have correct information as to the quantity of oil on board.

The refueling of the ship began shortly after she came to the dock about 6:30 p. m. and continued for some hours with several unusual and unexplained interruptions. The process was stopped on two or more occasions for periods of about two hours, and the dock master of the oil company was convinced that the engineers did not understand the oil lines of the ship. Finally when he became aware by the splashing of oil, that it was overflowing on the ship, he again stopped the pumps, and very shortly thereafter the fire occurred.

At the time of the refueling, the ship's dynamos were not operating so that electric lights were not possible, and lanterns were being used, one of which was in the engine or fire room for the observation of the gauges. During the operation, the smoke uptakes in the boiler room became red hot, or at least sufficiently hot to ignite an inflammable substance like oil or oil spray brought in contact with them. The fire broke out when the deep tank had been filled and was in the process of being topped off. After the fire, the tank showed signs of having been subjected to strong internal pressure, and an elbow in the fueling line to the deep tank was found to have been fractured. The preponderance of the evidence showed that when the elbow burst, oil was sprayed from the fracture and, coming in contact with the red hot uptakes or the lantern in the engine room, brought about the fire. The bursting of the elbow was due to excess internal pressure caused by the fact that the vents to the deep tank, where the oil was stored, were not of proper size or construction, and when the deep tank became full, the vents could not relieve the pressure. The defect in the vents was their failure to comply with the following rule of the American Bureau of Shipping which was in effect at the time that the ship was built and when the fire took place:

"Vent pipes are to be fitted at the highest part of the tank top and at the corners; the total area of the pipes should be at least twice that of the supply pipes, and every precaution is to be taken by punching airholes, etc. to prevent the risk of airlocks in any part of the tank; inspection plugs should be accessible at all times when the tank is full and should be left off when filling tank."

Although the rule required that the total area of the vent pipes be at least twice that of the supply pipes, the fueling and vent lines on the Pinellas were of the same dimension. Thereby the internal pressure in the system was greatly increased, and this result was accentuated by the fact that the vent lines did not run vertically in a straight line. They ran for a short distance vertically to an elbow; then horizontally for some distance and then again vertically through the deck to a gooseneck. By this defective construction, a situation was created which, in the opinion of the experts, made possible a fire, and helped to bring about the catastrophe which took place. The testimony was not all one way—other explanations were offered, but they were rejected by the court as unsatisfactory and less convincing than that which has been stated. Our examination of the record convinces us that this finding was correct, and we approve the conclusion that the defective vents contributed as a proximate cause to the fire.

In addition, the District Court found that the chief engineer of the Pinellas was incompetent and that his incompetency also contributed in some measure to the fire. He had never been to sea on an oil-burning steamer, and the impression he made upon those with whom he came in contact during the fueling and after the fire was that he was unfit for the position. Shortly after the fire, he was discharged for incompetence and excessive

use of intoxicating liquor. Later on he was reinstated by the direct orders of the Shipping Board. He was employed in the first instance by the president of the operating company, who had had some experience in the selection of masters and engineers of ships. He was assisted in the selection of crews by a marine superintendent, a man of practical experience, but the president himself exercised final authority. The president was not favorably impressed at the time of his preliminary interview with the chief engineer, but sent him to the marine superintendent. The latter was not produced as a witness in the case. There is abundant testimony to show that the chief engineer was grossly incompetent and no explanation of his employment was offered. Hence the finding of incompetency by the court is sustained beyond any reasonable doubt.

The shipowner nevertheless contends that the incapacity of the chief engineer, even if proved, is immaterial for the reason that the fueling was not in his charge but in that of the second assistant engineer, who had some experience in such matters. The District Judge rejected this contention, and we think rightfully. The testimony shows that the fueling of the ship under the circumstances of this case was an important and difficult operation which should have been done under the supervision of an experienced and superior officer. None of the engineers on the ship had a clear appreciation of the fact that by reason of the peculiar structure of the vent pipes, unusual caution to prevent an excess of internal pressure was required. The second assistant engineer traced out the oil lines of the ship before the operation, but he did this in company with the chief, and the latter even after the fire showed complete ignorance of the system. The unexplained and unusual interruptions during the progress of the fueling under the supervision of the second assistant indicated that the new engineering force on the ship was not well acquainted with the work they were doing. It is a fair inference from all the facts that had the operation been in charge of men of experience and skill, the fire could have been prevented.

The District Court was of the opinion that the ship was unseaworthy both because of the defective construction of the vents in the fueling system, and also because of the incompetence of the engineers, and held that in both respects the owners were negligent and, therefore, not entitled to the benefits of the fire statute. The owners contend that even if the ship was unseaworthy, the evidence does not show that they were personally negligent in this respect, because the ship was built by an experienced and competent builder and was passed by official surveyors of the American Bureau of Shipping as being seaworthy in all respects; and it is pointed out that in such well-known cases as Walker v. Transportation Co., 3 Wall. 150, 153, 18 L. Ed. 172, and The Strathdon (D. C.) 89 F. 374, it was held that the neglect which deprives the shipowner of the protection of the Fire Statute is his personal neglect and not merely the neglect of his officers or agents in charge of the ship. But in each of these cases, there was no showing that the ship was unseaworthy at the beginning. The negligent conduct complained of took place during the course of the voyage. There is authority for the rule that even if the owner is not guilty of negligence personally, the statute does not bar recovery against the ship if she was unseaworthy at the beginning of the voyage by reason of the negligence of the owner's employees. It is said that the implied warranty of seaworthiness applies to every contract of affreightment and imposes upon the owner the duty of furnishing a seaworthy ship which may not be delegated by him to any one else. See The Etna Maru (C. C. A.) 33 F.(2d) 232.

■■ We are not disposed to criticize the rule laid down in this case, but it is not necessary to go to this length in order to find ample ground upon which to sustain the decision of the District Court. The shipowner does not contend, and indeed there is no basis for the contention on the evidence in this case, that the employment of the engineering force was not the personal act of the owner of the ship. The Pinellas was the property of the Shipping Board and was being operated for the owner by the Carolina Company, whose president employed the engineers in question. He was a managing officer of the operating agent, and his neglect was the neglect of the owner under the rule laid down in Standard Wholesale Phosphate & Acid Works v. Chesapeake Lighterage & Towing Co. (C. C. A.) 16 F.(2d) 765. It is a sufficient answer to the shipowner's contention in this case that it was personally negligent in the employment of an incompetent crew, and that this neglect was a contributing cause to the fire which damaged the cargo. See Bank Line v. Porter (C. C. A.) 25 F.(2d) 843.

■ The conclusions announced also disposed of the defense of the shipowner based upon section 3 of the Harter Act (U. S. Code title 46, § 192 [46 USCA § 192]), which provides amongst other things that if a shipowner shall exercise due diligence to make his vessel

in all respects seaworthy and properly manned, he will not be held responsible for damages or loss resulting from faults or errors in navigation or in the management of the vessel. Such diligence was not exercised in this case and the statute affords the shipowner no protection.

██ Nor is the shipowner entitled to general average contribution as claimed in the cross libel. The so-called Jason clause, found in the bills of lading in this case, requires that the owner of the ship shall have exercised due diligence to make the ship in all respects seaworthy and properly manned in order that the cargo shall contribute in general average with the shipowner.

The District Court also upheld the contention of the cargo owner that the shipowner was liable for damages by reason of the deviation involved in the towing of the ship from Savannah to Charleston, but it is unnecessary to consider this matter since the grounds already discussed furnish a sufficient basis for the conclusion of the court.

The decrees of the District Court are therefore affirmed.