### UNIVERSAL LEAF TOBACCO CO. OF CHINA v. BANK LINE, LTD.

United States District Court
S. D. New York.

May 15, 1953.

Bigham, Englar, Jones & Houston, New York City, Proctors for libelant, John W. R. Zisgen, New York City, of counsel.

McNutt & Nash, New York City, Proctors for respondent, James E. Freehill, New York City, of counsel.

SUGARMAN, District Judge.

Libelant, Universal Leaf Tobacco Company of China, sues respondent, Bank Line, Ltd., to recover the value of a cargo of hogsheads of tobacco allegedly damaged by reason of contact with oil and water while being transported from Newport News to Shanghai aboard respondent's vessel, the SS "Irisbank". The cargo was shipped by and consigned to libelant under three bills of lading, two

of which are dated July 10, 1946 and one is undated.

The cargo involved in this suit was loaded in the No. 2 hold on July 10, 1946 at Newport News and the "Irisbank" sailed from that port on that date. She proceeded via the Panama Canal and stopped at San Pedro to take on fuel oil. The balance of the cargo was thereafter loaded at San Francisco. The next leg of the voyage took her to Manila after which the "Irisbank" proceeded to Hong Kong and then to Shanghai where she arrived on October 4, 1946. The weather between San Francisco and Manila and between Manila and Shanghai was exceptionally heavy, causing strain to the vessel and some damage to her gear.

Libelant's tobacco was unloaded at Shanghai after some delay because of a strike and rain. The Chief Officer, Kemp, was informed that some of the hogsheads were found to be stained with oil when discharged and he thereupon inspected the No. 2 lower hold where he found that other hogsheads still aboard in the vicinity of the after port manhole cover of the No. 2 deep bottom tank were oil-stained, as was the dunnage in that area.

This cover of the No. 2 deep bottom tank was a steel plate about fourteen inches in diameter designed to be secured to the tank top by sixteen nuts and made oil-tight by tightening down the nuts after a gasket was placed between the cover and the tank top. Grommets and steel washers are usually placed on the studs before the nuts are put on. A coaming three inches high was fixed about the manhole cover to prevent damage to the bolts and nuts securing the cover. Kemp found a quantity of oil within this coaming when he inspected the area after the dunnage was cleared. He also found that two or three of the nuts were slack resulting in a leak. Li-

belant's cargo was damaged by contact with fuel oil that escaped from the tank through this leak.[1]

██ Respondent is a common carrier and its failure to deliver the cargo in good order and condition raises a presumption of liability and places upon it the burden of bringing itself within an exemption from liability for negligence or unseaworthiness or it must show that the damage was not caused by its fault.[2] The respondent has carried this burden and has established that the "Irisbank" was seaworthy and that the leak in the tank cover was not caused by any negligence for which it is responsible.

The "Irisbank" had undergone a major overhaul and had been surveyed at Belfast by Lloyds Classification Surveyors between November, 1945 and June, 1946. In the course of this survey, the No. 2 deep bottom tank was opened, cleaned, restored to proper condition and then it was subjected to a hydrostatic test to insure its seaworthiness. No seepage or leakage was disclosed in this test and the vessel was rated 100A–1 on completion of the entire survey.

She left Belfast for New York shortly thereafter and arrived on June 24, 1946 after a voyage that was routine and uneventful except for several days of fairly heavy weather. During this voyage, the No. 2 double bottom tank was full of fuel oil until June 18th, when some was drawn off for use in the main engine. When the "Irisbank" arrived at her Staten Island pier, she was inspected by respondent's Marine Superintendent, Graham F. Andoe, who found no oil leakage from the tank. He inspected the tank top manhole covers and found that the area within the coamings was dry and the nuts appeared sound and tight. Andoe's inspection was made to ascertain the vessel's fitness to receive cargo and his opinion that the No. 2 double bottom.

1. The pleadings raise an issue whether any of the cargo was damaged by contact with water. In answer to respondent's interrogatories, libelant claims that fresh water damaged three casks of tobacco. No proof of such damage was adduced and accordingly this claim is deemed abandoned.

2. Edmond Weil, Inc., v. American West African Line, 2 Cir., 147 F.2d 363, 366.

tank was at that time seaworthy was correct and the court so finds. If the tank covers were slack between Belfast and New York, the leak would have been evident, but no such leakage was observed en route or at New York.

Kemp, the Chief Officer, supervised the cleaning of No. 2 hold and bilges at New York and on the way to Newport News and he too found no leakage through the tank top at the covers.

From New York, the vessel went to Newport News, where libelant's cargo was loaded. Prior to the loading, Chief Officer Kemp again inspected the holds, including the No. 2 lower cargo hold whose bottom constituted the top of the No. 2 double bottom tank. He found the tank top in apparent proper condition with no trace of oil seepage or leakage.

There is no question of negligence in the manner in which libelant's tobacco was stowed. The evidence shows no neglect in this regard and no such claim is urged by libelant.

The tanks were sounded regularly throughout the passage from Belfast to New York to Newport News, when the weather permitted, to ascertain the level of the fuel oil therein and no unusual losses were noted. Similarly, soundings of the bilges were regularly made and recorded and no taint of oil was discovered on the sounding rods. The absence of any evidence of leakage of oil from the No. 2 double bottom tank relieved the respondent from any duty of taking other measures to ascertain its seaworthiness before loading libelant's cargo, especially in view of the recent Lloyd's survey and reclassification of the vessel.[3] Thus, as will appear, the contamination of the cargo was not occasioned by unseaworthiness of the vessel at the commencement of the voyage.

After she left Newport News, the "Irisbank" passed through the Panama Canal and proceeded to San Pedro where she bunkered on July 27th. The No. 2 double bottom tank was filled at San Pedro and remained practically full until the discharge of cargo at Shanghai.

The weather and seas encountered between San Pedro and Shanghai were extremely heavy, causing unusual rolling and pitching of the ship.

The oil in the full No. 2 double bottom tank expanded when the vessel entered warmer waters exerting undue pressure on the manhole cover. This pressure concurred with the straining of the vessel as it pitched and pounded in the heavy seas, and the result was the slackening of the nuts which secured the No. 2 double bottom tank cover. The development of this leak could have been averted by drawing off enough of the oil to relieve the pressure created by the expansion. However, the failure of the Master or engineer to do so, knowing, as the log establishes they did, that this tank was filled to capacity, was an error of management of the vessel for which respondent is not liable.[4]

The respondent has carried its burden of proving that the damage to libelant's cargo was sustained through an excepted cause and accordingly, the libel is dismissed.

This decision may serve as the findings of fact and conclusions of law unless either party desires more formal findings and conclusions. Settle decree in conformity with the foregoing.

3. The Floridian, 2 Cir., 83 F.2d 949.

4. 46 U.S.C.A. § 1304(2) (a); See Edmond Weil, Inc., v. American West African Line, Note 2, Supra, 147 F.2d at page 367.