ILIGAN INTERNATIONAL CORP. and
Iligan Integrated Steel Mills, Inc.,
Plaintiffs,

v.

S. S. JOHN WEYERHAEUSER, her engines, boilers, etc., et al.,
Defendants.

No. 67 Civ. 1137.

United States District Court,
S. D. New York.

March 14, 1974.

Donovan, Donovan, Maloof & Walsh, New York City, for plaintiffs; David L. Maloof, Donald M. Kennedy, New York City, of counsel.

Symmers, Fish & Warner, New York City, for defendant Weyerhaeuser Co.; William Warner, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant New York Navigation Co., Inc.; M. E. DeOrchis, LeRoy S. Corsa, Chester D. Hooper, New York City, of counsel.

ROBERT J. WARD, District Judge.

In this admiralty action, Iligan Integrated Steel Mills, Inc.[1] ("Iligan") seeks to recover approximately $2,200,000 representing the full amount of damage to cargo sustained during a voyage to Iligan City, Republic of the Philippines, in December, 1966.[2]

In July of 1966 Iligan negotiated a contract with defendant New York Navigation Company, Inc. ("New York Navigation") by which the latter agreed to provide ships for the transport of machinery and parts for a steel mill which Iligan was then building in the Philip-

1. At the trial Iligan International Corp. was dropped as a plaintiff, and seven named insurance companies were added, as real parties in interest. All of these parties will be referred to in this opinion as "Iligan" or as "plaintiff."

2. The Hon. Edward C. McLean conducted a three and one half day non-jury trial in July, 1972. After his death the case was transferred to me, and the parties stipulated to a decision upon the record of the trial already had, supplemented by a relatively brief oral argument. This was held February 7, 1974.

pines. New York Navigation in turn signed a charter party with defendant Weyerhaeuser Company ("Weyerhaeuser") using the New York Produce Exchange Time Charter form, with certain modifications and fifteen added clauses. In this charter party New York Navigation hired Weyerhaeuser's vessel, the defendant ship S. S. JOHN WEYERHAEUSER, for a single voyage from the East Coast of the United States to the Far East. The ship was delivered to New York Navigation at Baltimore, Maryland on December 12, 1966, and the Iligan cargo loaded during the next several days. On December 16, 1966, New York Navigation as agent for the master signed a bill of lading which constitutes the contract between Iligan as shipper and Weyerhaeuser as carrier of the goods.

The steel mill cargo arrived in the Philippines virtually destroyed. Seawater had entered the ship through a leaking clapper valve in an adjacent hold and mixed with a cargo of fertilizer stowed there to form a slurry, which then penetrated the bulkhead separating the two cargoes and inundated Iligan's cargo. Iligan contends that the failure of the owner to discover and repair the unseaworthy condition of the ship prior to this voyage constitutes gross negligence or wilful and wanton misconduct and entitles plaintiff to recover the full value of the destroyed cargo. Plaintiff also seeks to recover the full value of the cargo from the charterer, alleging that New York Navigation breached both an express and an implied absolute warranty of seaworthiness and is not entitled to the benefit of its contract terms limiting the amount of its liability to $500 per package. New York Navigation claims that, if it is found liable to Iligan, Weyerhaeuser is liable over to it, because the charter party contains an express absolute warranty of seaworthiness. Weyerhaeuser defends on two major grounds. First, it contends that it exercised due diligence to provide a seaworthy vessel, and is therefore not liable

to Iligan for any damage caused by unseaworthiness of the vessel, under the provisions of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., ("Cogsa"). Second, it claims that if it is found liable, this liability is limited in amount to $500 per package, as to Iligan by virtue of Cogsa's provisions, and as to New York Navigation by virtue of express contract terms.

### The Facts

Certain facts are not in dispute. The vessel is a reconstructed Liberty ship, built in 1944, which Weyerhaeuser, primarily a lumber company, acquired after World War II together with five others, for the purpose of transporting lumber from the West Coast of the United States to the East Coast. Weyerhaeuser commonly chartered these vessels for voyages from the East Coast to the Far East and back to the West Coast, continuing to transport its own lumber aboard them on the coastal voyages. The ship was substantially remodeled and reconditioned by Weyerhaeuser in 1961, at which time it completely rebuilt the crew's quarters, and also removed the permanent, watertight bulkhead separating the # 2 and # 3 holds, so that lumber could be more conveniently carried. A single set of port and starboard bilge tanks, located in the after end of # 3 hold, still served the common hold.

In # 3 hold, about twenty-two feet above the bilge tanks on either side, there is a pipe called a sanitary or soil line which drains from the crew's toilets, exits the ship through an opening in the hull, and permits waste to be discharged outside the ship. When the ship is not heavily laden this opening is above the level of the sea; when the ship is loaded it is under water. At the point it exits the ship the pipe makes a sharp right angle. There is a cover plate over the opening of the pipe, called a clapper valve; this rests on lugs and is designed to swing open to allow discharge of waste, but to resist the pres-

sure of the sea and to keep seawater out. The entire apparatus is also referred to in the record as a sanitary valve.

On the voyage in question, New York Navigation constructed a temporary bulkhead of boards and burlap to divide # 2 and # 3 holds, since it planned to load the Iligan cargo in one and fertilizer in the other. The Iligan cargo was loaded into # 2 hold in Baltimore between December 12 and December 16, 1966, in good condition. The ship proceeded to Tampa, Florida, where a cargo of chemical fertilizer was loaded into # 3 hold in such a way as to fill the hold completely. The vessel stopped once more, in Cristobal, Panama Canal Zone, for bunkers and engine repairs, before proceeding on the trans-Pacific voyage in mid-January.

Upon the ship's arrival in Moji, Japan, on February 22, 1967, to take on fresh water, it was discovered to be riding much lower in the water than anticipated, so that no additional water could be safely taken on. This led the master to suspect massive abnormal water entry into the ship. His investigation revealed that the entire # 2 hold containing the Iligan cargo was flooded. (Two days earlier, he claims, the cargo had been intact.) Further investigation revealed that the port sanitary valve in # 3 hold was leaking, and the master directed that the pipe at this juncture be covered with a cement box. A cement box was installed on the starboard valve as well. The vessel proceeded to Mokpo, Korea, where the fertilizer was unloaded and the cement box on the port valve replaced, and thence to Iligan, where the crew dismantled the sanitary valve. The clapper valve lugs were found to be completely corroded with rust, so that the valve was frozen in an open position, and the sanitary line pipe was corroded through, with a hole approximately 2″ by ¼″. This condition had clearly developed over time. The combined openings had apparently permitted a massive entry of seawater into the # 3 hold, which slowly permeated the fertilizer, formed a slurry, and final-ly burst through the non-watertight bulkhead into the # 2 hold, inundating and destroying the Iligan cargo.

The evidence crucial to plaintiff's case is contained in the deck and engine room logs of the Iligan voyage and those immediately prior to it. The ship had carried a cargo of fertilizer from Virginia to Madras, India in July and August of 1966 ("the Madras voyage"), then had sailed to Portland, Oregon ("the return Pacific voyage") in ballast, and had carried lumber from Oregon to Rhode Island in October and November ("the coastal voyage"). On these voyages the crew usually recorded both the bilge readings and the frequency of pumping on a daily basis.

The bilge wells in # 3 hold are eighteen inches deep. Plaintiff's expert considered any reading above seven inches to be noteworthy, and pointed out that any reading above eighteen inches meant that there was water in the cargo. Weyerhaeuser's operations manager, whose deposition testimony was introduced at trial, considered consistent readings of as much as thirteen to fifteen inches to indicate a serious problem of water entry.

On the Madras voyage the soundings in the # 3 bilges ranged from insignificant levels to fifteen inches. The logs reflect pumping of the # 3 bilges on a daily basis. On the return Pacific voyage no soundings were taken, as the ship was proceeding with water ballast in two other holds. The # 3 bilges were, however, pumped daily. On the coastal voyage the # 3 bilge readings ranged consistently above nine inches, and frequently as high as fifteen to twenty-four inches, but there were no engine room log entries during the latter part of the voyage to reflect the frequency of pumping. (The chief engineer, who apparently was deficient in several respects, left the ship and was replaced in Baltimore.) In Baltimore for several days the bilge readings were abnormally high, as high as eighteen inches, and the bilges were pumped once.

In Tampa, as noted above, a large load of fertilizer was put aboard the ship, completely filling the # 3 hold, and making the sanitary valve inaccessible for inspection or repair from that time forward. En route to the Panama Canal the ship experienced engine difficulties which caused it to put in to Cristobal for repairs. At that time it also took on fresh water. In Cristobal, for the first time, the # 3 bilge readings consistently exceeded fourteen inches, and frequently reached over twenty inches. The crew then pumped the bilges on an almost daily basis. Iligan charges that from this data the master and the owner had to know that the ship was leaking and unseaworthy.

Weyerhaeuser rebuts this evidence in two ways. It offers specific explanations for each of the instances of high readings which Iligan notes, and points to specific steps the master took to locate and solve the problem. Beyond this, Weyerhaeuser claims that the ship was routinely and thoroughly inspected and maintained in class, and that the owner cannot be charged with notice of an unseaworthy condition. These facts combined, it claims, demonstrate that it fulfilled its obligation to exercise due diligence to provide a seaworthy vessel.

The master testified that he regarded the bilge readings on the Madras voyage as a problem, and associated the abnormal readings with taking on fresh water. On his return to Portland he claims he reported the difficulty to Weyerhaeuser's marine superintendent. He also consulted with the chief engineer, who assured him, after checking, that there was no possibility of water entry into the bilges from the fresh water system. On the coastal voyage he was accustomed to high bilge readings and did not attribute them to water entry, since lumber typically "sweats" as it is carried from a cold to a warm climate and back. He explained the high readings in Baltimore on the basis of a heavy snow which made it impossible to close the hatch cover and also delayed loading of the cargo. A single pumping sufficed to empty the bilge well at that time.

When the master began to note abnormal bilge levels in Cristobal, he once again attributed this to taking on fresh water, despite the chief engineer's assurance that this was not possible. At this time he did not report the problem to the owner. He made what limited inspection was available to him in view of the nature of the cargo in # 3 hold; he attempted to taste the water on the end of the bilge sounding rod to determine whether it was fresh. He claims he tasted fresh water, and judged it safe to proceed with the voyage. Thus, he claims that he first recognized a serious problem when he arrived in Moji and found the ship down, inexplicably, to its summer marks.

Weyerhaeuser proved that the ship was inspected thoroughly by the Coast Guard in 1962, and less thoroughly annually. In 1962, the clapper valves were opened and visually inspected and found to be in good condition. Each year thereafter, and particularly in Portland just prior to the coastal voyage, the ship was routinely inspected for the purpose of being maintained in class. It was maintained in class, and indeed was eligible for more favorable insurance rates than other Liberty type vessels, because of its generally good condition. While the routine inspections did not include opening the clapper valves, they did include as a matter of course, hammer testing the valves for soundness. The written reports of these inspections indicate no problem with the valves. Weyerhaeuser did not, however, introduce testimony from anyone actually present at the inspections who could report that they were in fact properly conducted. One special inspection of # 3 hold was made in Tampa, by a National Cargo Bureau surveyor, to certify that the hold was dry before fertilizer was loaded. Although concededly the hold was dark, and the valve high above eye level, the inspector did not report any leaking on the skin of the ship, and did permit the fertilizer to be loaded.

■ The obligation to furnish a seaworthy vessel rests in the first instance with the owner of the vessel, Weyerhaeuser. Plaintiff contends that Weyerhaeuser had actual knowledge, prior to the Iligan voyage, that the ship was unseaworthy, and loaded the cargo and sent the ship to sea in wilful disregard of this condition. In plaintiff's view, such gross negligence or wilful and wanton misconduct constitutes a deviation abrogating all limitations of liability either under Cogsa or in the contracts. Weyerhaeuser claims that it exercised due diligence to provide a seaworthy vessel and is therefore not liable for any damage to cargo resulting from the unseaworthy condition of the ship.

In the judgment of this Court, plaintiff has not proved that Weyerhaeuser knew or must have known of the unseaworthy condition of the ship. Nor has Weyerhaeuser proved the exercise of due diligence to provide a seaworthy vessel.

The ship was clearly unseaworthy in Cristobal, because of a corroded clapper valve which deteriorated over time. At Cristobal the clapper valve was below water and the ship was taking on significant quantities of water which were at that time confined to the # 3 hold. But the master did not, in Cristobal, have knowledge of the actual defect in the ship. And at that time the valve was inaccessible for his inspection. Although he had received earlier signals, none had clearly pointed to the clapper valve. His explanations of the high bilge readings were not wholly implausible, until the "taste test" in Cristobal.

On the other hand, the signals were sufficiently clear to put the owner on notice that there was some problem with water entry. The master had reported the problem in Portland, and after each voyage the marine superintendent read the logs. A sufficiently thorough inspection of possible sources of this water entry would, in all likelihood, have revealed the deteriorating valve. Weyerhaeuser's failure to locate the problem was want of due diligence to provide a seaworthy vessel. The burden is on the shipowner to prove the exercise of due diligence; Weyerhaeuser's evidence of routine inspections, in the context of an unusual problem, does not suffice to carry this burden.

After a complete review of the evidence, this Court finds that Weyerhaeuser failed to exercise due diligence to provide a seaworthy vessel, but did not have actual knowledge of the unseaworthy condition of the ship prior to the trans-Pacific voyage in question. Weyerhaeuser is therefore liable to plaintiff in the amount of $500 per package plus interest in accordance with the provisions of Cogsa and the applicable contracts, as discussed below.

### Iligan against Weyerhaeuser

■ Iligan admits that as between itself and Weyerhaeuser, the contract of carriage was the bill of lading dated December 16, 1966. Thus, Cogsa applies of its own force, since the bill of lading is "evidence of a contract for the carriage." 46 U.S.C. § 1300.

Under Cogsa, unless the contract otherwise provides, the carrier is liable for damage to cargo caused by the unseaworthiness of the vessel only in the event of want of due diligence to make the ship seaworthy, and in that event, only to the extent of $500 per package. 46 U.S.C. § 1304(1), (5). Iligan contends that if the conduct of the carrier in sending an unseaworthy vessel to sea exceeds "want of due diligence" and can be characterized as gross negligence or wilful and wanton misconduct, it will constitute an "unreasonable deviation" from the contract of carriage, and will entitle the cargo owner to the benefit of that line of cases which hold the carrier liable as an insurer for the full amount of damage. See, e. g., The Willdomino, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); The Louise, 58 F.Supp. 445 (D.Md.1945); Jones v. The Flying Clipper, 116 F.Supp. 386, 387 (S.D.N.Y. 1953).

This is admittedly a novel theory, and this Court is not prepared on the facts before it so to extend the sweep of the

concept of "deviation." Essentially Iligan attempts to combine reasoning from early cases dealing with breach of the implied warranty of seaworthiness, at one time rigorously imposed by the courts on every contract for the carriage of goods by sea, with the now equally rigorous concept of deviation from the contract of carriage which abrogates all clauses limiting the liability of the carrier. Such a blend does not comport with current admiralty law.

## A. *The Warranty of Seaworthiness*

The courts at one time implied an absolute warranty of seaworthiness into every contract for the carriage of goods by sea. *See,* Knauth, Ocean Bills of Lading, 192, et seq., (1953); 1 Carver, Carriage by Sea § 102, et seq. (12th ed. 1971); The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644 (1895). Breach of this warranty was a failure of condition and, if material, permitted the shipper to refuse to load his cargo and thus to repudiate the contract. *See* Aaby v. States Marine Corporation, 181 F.2d 383 (2d Cir. 1950), cert. den., 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609 (1950). Breach also permitted the shipper to recover for resulting damage to cargo. The Caledonia, *supra*; The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928). But breach of this warranty did not serve wholly as an "ouster" of the contract; the carrier became liable only for that damage causally connected to the unseaworthiness. Gilmore and Black, The Law of Admiralty § 3–27, n. 34, at 129 (1957). For the protection of the shipper, the parties were permitted contractually to limit this obligation only with the clearest language; in the United States the courts refused to enforce even clear contract terms relieving the carrier of the obligation to exercise due diligence. *See* Knauth, *supra*, at 192; Gilmore and Black, *supra*, at 120. A clause limiting the amount of liability for damage to cargo, in the absence of terms clearly reducing the obligation to provide a seaworthy vessel, left the ship liable for the full amount of damage caused by unseaworthiness. Carver, *supra*, § 127.

The Harter Act of 1893, 46 U.S.C. §§ 190–195, codified this judicial policy, while at the same time permitting the carrier to "except", that is to eliminate liability entirely, damage caused by certain specified conditions or events, including certain deviations (see discussion, *infra*) provided that it had exercised due diligence to make the vessel seaworthy. Cogsa went further, and for certain bills of lading entirely abolished the absolute warranty of seaworthiness, replacing it with an obligation to exercise due diligence. 46 U.S.C. § 1304; *see* Knauth, *supra*, at 193. Cogsa also permitted the carrier to limit its liability for failure to exercise due diligence to not less than $500 per package, 46 U.S.C. § 1304(5), and completely relieved the carrier of liability for losses from certain specified causes, regardless of whether it had exercised due diligence. 46 U.S.C. § 1304(2). Thus, the once rigorous obligation imposed upon carriers has been significantly lessened; and the cases plaintiff cites must be read in the light of this statutory evolution.

## B. *Deviation*

The concept of deviation from the voyage has also evolved. Originally, a deviation meant a geographic departure from the voyage planned, which was thought to displace any exceptions and limitations on liability contained in the contract of carriage, on the theory that this was now a different voyage with different risks and the contract was inapplicable. See the discussion in Knauth, *supra*, at 240–270; Gilmore and Black, *supra*, §§ 3–40, et seq. At one time any departure from the contract or usual route was such a "deviation," see Knauth, *supra*, at 255, but the Harter Act introduced the concept of excusable deviations without such drastic effects. Generally, the carrier was held fully liable, as an insurer, contract clauses to the contrary notwithstanding, for damage incurred during a voluntary departure

from the contracted or usual course, such as to pick up or discharge passengers or cargo. The carrier was not so liable, however, if the deviation were mandated by some exigency such as the need for crucial repairs or the declaration of war. *See, e. g.,* Charbonnier v. United States, 45 F.2d 166, 172 (E.D.S. C.1929), aff'd, 45 F.2d 174 (4th Cir. 1930). Thus, displacement of the contract of carriage, as a consequence of deviation, must be distinguished from failure of condition as a consequence of unseaworthiness, discussed above. The former renders the carrier liable as an insurer and imposes obligations beyond the terms of the contract; the latter entitles the shipper simply to repudiate the contract. *See,* Knauth, *supra,* at 253–254.

The concept of deviation has been extended to include non-geographic departures from the terms of the contract, which materially increase the risks to the cargo, and are said, by analogy, to make the voyage completely different from that contracted for. Such departures from the terms of the contract include stowage on deck rather than below deck, or proceeding in tow. *See, e. g.,* Jones v. The Flying Clipper, *supra.* But see DuPont de Nemours Int. S.A. v. S. S. Mormacvega, 493 F.2d 97 (2d Cir. 1974).

### C. *Deviation and Seaworthiness*

A series of cases, all subsequent to the enactment of the Harter Act, and most, post-Cogsa, delineate the relationship of unseaworthiness and deviation. The Willdomino, *supra,* held that a geographic departure from the route planned, to correct an unseaworthy condition, when the emergency which necessitated the departure was caused by the inexcusable negligence of the owner, was not a justifiable deviation. As a result, the owner became liable as an insurer for the damage suffered by the cargo. The Court did not discuss whether the contract was displaced and prepaid freight refunded.

The Malcolm Baxter, Jr., *supra,* one year later, held that, even in the case of

a geographic deviation to correct an unseaworthy condition resulting from the negligence of the carrier, the owner was liable only for the damage caused by the unseaworthiness, and not that caused by collateral consequences of the change in route. The contract was still in force, and prepaid freight accordingly retained by the carrier.

The Waalhaven, 36 F.2d 706 (2d Cir. 1929), cert. den., 281 U.S. 747, 50 S.Ct. 352, 74 L.Ed. 1159 (1930), held that a geographic departure to correct an unseaworthy condition which the owner ought to have foreseen was not of itself a deviation displacing the contract of carriage. Where, however, the owner did actually know in advance of the unseaworthiness, and deliberately sent the ship to sea knowing that a change of route increasing the risk to the cargo was inevitable, the deviation was voluntary and the owner was liable as an insurer for resulting cargo damage.

By comparison, The Louise, *supra,* held the carrier liable as an insurer, and obligated to refund prepaid freight despite contract terms to the contrary, where the geographic deviation to correct an unseaworthy condition was caused by "gross negligence" of the carrier. To support the finding of "gross negligence" the court pointed out that the carrier had specific knowledge of the unseaworthy condition of the ship, and knew that successful completion of the contracted voyage was impossible. *See also,* Royal Ins. Co. v. United States, 87 F.2d 714 (2d Cir. 1937).

Thus, it appears that the discussions of negligence and gross negligence were important in these cases because geographic deviations to correct unseaworthy conditions which endangered the safety of the vessel were excusable, unless the shipper were guilty of gross negligence. Only in the latter event was the shipper liable for the entire cargo damage, despite contract clauses limiting its liability.

█ Iligan now argues for a rule that, if the carrier takes the cargo to

sea in disregard of a known unseaworthy condition, even though it follows the contract route, it is liable, as an insurer for all resulting losses, since its "gross negligence" has materially increased the risk of transport and thus displaced the contract of carriage. No case has yet so held. *See,* United States v. Wessel, Duval & Co., 115 F.Supp. 678, 684–685 (S. D.N.Y.1953). Indeed, Gilmore and Black favor restriction rather than expansion of the concept of non-geographic deviation, in view of the terms of insurance commonly available to cargo shippers today. *See* Gilmore and Black, *supra,* at 160–161; *see also,* Carver, *supra,* at § 750; Knauth, *supra,* at 249.

The logic of this view is supported by the statutory evolution in the liability of the carrier for the seaworthiness of the vessel, discussed above. The shipper knew there was no absolute warranty of seaworthiness. The exercise of due diligence will always prevent the carrier from sending the ship to sea in a known unseaworthy condition. The shipper accepts the risk that the carrier will not have exercised due diligence to make the ship seaworthy, and can protect itself from the $500 package limitation on recovery for consequent cargo damage by the simple expedient of declaring a higher value on the cargo. The rule for which plaintiff so vigorously argues is not the sole protection available to cargo owners, as was once the implied absolute warranty of seaworthiness.

Even were the court prepared to accept plaintiff's legal theory, the record here does not warrant a conclusion that defendant Weyerhaeuser was guilty of wilful and wanton misconduct. Even in the context of a geographic deviation, the courts have made such a finding only where the master had specific knowledge of the ship's unseaworthy condition, indeed, of the specific defect, to the point of knowledge that successful completion of the voyage was impossible. *See* The Louise, *supra;* The Waalhaven, *supra.* The facts set forth above preclude such a finding in this case.

■ The evidence clearly indicates that the vessel was taking water at Cristobal and throughout the subsequent Pacific voyage, and was, therefore, unseaworthy. It also clearly shows that the shipowner failed to exercise due diligence to provide a seaworthy vessel by making sufficiently thorough inspections to discover and cure the source of prior abnormal bilge readings. But the evidence reflects that the clapper valve was above water, even as the bilges were pumped daily, on the earlier Pacific and coastal voyages, that the vessel was routinely inspected and maintained in class, that there had been no prior difficulties on this ship pertaining to the clapper valves, and that the master did make several attempts, although retrospectively in the wrong direction, to locate the source of the high bilge readings. There was here no wilful and wanton misconduct.

Thus, the Court finds it unnecessary to consider plaintiff's claim that the statute is unconstitutional if interpreted to permit the wilful disregard of the unseaworthiness of the vessel.

D. *Error of Management*

■ Weyerhaeuser claims that the failure to repair the valve was an error of management for which, under 46 U. S.C. § 1304(2)(a), it is not liable, regardless of its lack of due diligence. But the vessel was unseaworthy at the beginning of the voyage, because of a condition not wholly within the power of the master to locate and correct, particularly after the cargo had been loaded in Tampa. The damage was not caused wholly by failure of the master to inspect the vessel while in port, but rather by failure of the shoreside owners of the vessel, who did have notice of the problem of excessive water entry to conduct an adequate inspection to locate and correct the defect. *See,* The Walter Raleigh, 1952 A.M.C. 618 (S.D.N.Y.1951); Universal Leaf Tobacco Co. of China v. Bank Line LTD., 115 F.Supp. 353 (S.D. N.Y.1953); *see also,* May v. Hamburg,

etc., Gesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348 (1933); McKinnon Co. v. Moore-McCormack Lines, 1959 A. M.C. 1842 (S.D.N.Y.1959); Knauth, *supra,* 196 et seq. This Court has found that the shipowner, not merely the master, failed to exercise due diligence to provide a seaworthy ship, and consequently must be liable.

### E. *The Limitation of Liability*

■ The limitations of liability under Cogsa apply to the contract with the shipowner. Iligan points out that the bill of lading is worded to read: " . . . liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit," as contrasted with Cogsa's wording, which exonerates the shipowner from liability "in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, . . . " 46 U.S.C. § 1304(5). Plaintiff asserts that although the damaged goods were shipped in packages enumerated in the bill of lading, the amount of damages should be calculated by customary freight unit. It claims that a proper reading of the contract gives the cargo owner the option to choose the unit of measure of damages, and that Cogsa permits such a contract because it explicitly increases rather than decreases the shipowner's liability. 46 U.S.C. § 1304(6). But the preceding phrase of the clause cited by plaintiff reads "or, in the case of goods not shipped in packages, per customary freight unit." Also, clause (1) of the bill of lading explicitly provides that nothing in the contract shall be interpreted to increase the liability of the Carrier. In view of this specific language, the Court finds liability in the amount of $500 per package.

### F. *Interest*

■■ The award of interest on the amount recovered is within the discretion of the admiralty court. O'Donnell Transp. Co. v. City of New York, 215 F.2d 92, 95 (2d Cir. 1954). The allowance of interest is the general rule, and disallowance is supportable only in the face of exceptional circumstances. The Wright, 109 F.2d 699, 702 (2d Cir. 1940). The underlying rationale is the desire to make whole the injured party. Defendants have enjoyed the use of the capital now to be paid to plaintiff, and cannot now object to the award of interest on the ground that they were prepared to pay it earlier. Such a result would merely penalize plaintiff for its attempt to litigate when defendants were clearly at fault. Interest is awarded from the date of injury, March 26, 1967, the date the vessel arrived in Iligan City.

### G. *Prepaid Freight*

■ Plaintiff has made a claim for the return of the prepaid freight. The cases hold that such prepaid freight is to be returned only if there has been a deviation from the voyage which goes to the essence of the contract. The Louise, *supra;* The Waalhaven, *supra.* Since the Court has determined that here there was no such deviation, the prepaid freight shall not be returned.

### *Iligan against New York Navigation*

Plaintiff contends that even if the shipowner is statutorily protected by the provisions of Cogsa which limit its obligation to the exercise of due diligence to provide a seaworthy vessel, the charterer, New York Navigation, is not. Plaintiff argues that the operable contract between Iligan and New York Navigation is the Agreement of July 11, 1966 ("the Agreement") which contains an express warranty to furnish "seaworthy vessels" as well as an implied warranty to furnish a seaworthy vessel. The latter, as discussed below, is implied by law in every private contract of carriage and is not included in the Cogsa provisions which, with respect to contracts evidenced by bills of lading, reduce the implied warranty to furnish a seaworthy vessel to an obligation to exercise due diligence. The Agreement on its face contains no express provision limiting

the liability of the charterer, either as to standard of liability or as to amount. But Clause 11 of the Agreement incorporates by reference the terms of a standard form bill of lading, recited to be attached, which was, in fact, that actually used on this voyage. Clause 1 of the bill of lading in turn incorporates the provisions of Cogsa, and Clause 17 expressly limits liability for cargo damage to $500 per package.

Iligan contends that breach of the express warranty to furnish "seaworthy vessels" in itself operates to nullify the contract and therefore entitles it to recover full damages without the benefit of any package limitation incorporated by reference in Clause 11. In addition, it claims that breach of the implied warranty of seaworthiness operates as a failure of condition, with the same effect.

■■■■■ This Court agrees with plaintiff that the contract between Iligan and New York Navigation was the Agreement of July 11, 1966. However, it does not agree that this makes the charterer liable for the full amount of the damages suffered. Leaving aside for the moment the fact that Iligan did not treat the contract as nullified, but rather shipped the remaining installments of the steel mill on Weyerhaeuser ships under the terms of the Agreement, the law is clear that breach of an *express* warranty does not nullify the contract. The independent clauses limiting the amount of damages for breach of contract remain in effect. An inclusion of the Cogsa terms in the bill of lading, which was, in turn, incorporated into the Agreement, operates to reduce the *implied* warranty of seaworthiness, by contract, to an obligation to exercise due diligence.

A. *The Agreement*

Clause 11 of the Agreement stipulates that the bill of lading be stamped subject to the Agreement, the latter to control in case of inconsistency, although it appears that the actual bill of lading used on this voyage was not so stamped.

New York Navigation argues that this failure to stamp the bill of lading made it the final contract among the parties, since Clause 26 of the bill of lading states that it supersedes all prior agreements. New York Navigation signed the bill of lading as agent for the master, not as carrier. Thus, it contends that it had no obligation whatever with respect to the seaworthiness of the vessel.

■■■■■ Normally, in the hands of a signatory to a prior contract, usually a charter party, a non-negotiated bill of lading operates as a receipt or as evidence of a contract rather than as the final contract. *See* Carver § 58 et seq., esp. § 62, § 404; Gilmore and Black, *supra,* § 4–10; Nichimen Company v. M.V. Farland, 462 F.2d 319 (2d Cir. 1972). The provision in the Agreement that the bill of lading be stamped subject to its terms was not expressed as a condition, breach of which would void either the clause or the contract, but as an additional requirement. There has been no showing that the omission of the stamp was anything but inadvertent. The Agreement continued in force after this voyage and governed five more shipments of cargo to the Philippines. There is thus no indication, either in the document itself or in the conduct of the parties, that the Agreement was not the contract between the parties. Accordingly, the terms of the Agreement determine the obligations of New York Navigation to Iligan.

B. *The Express Warranty of Seaworthiness*

■■■■■ Breach of an express warranty does not nullify the contract, but rather entitles the party not in breach to recover damages. *See,* Carver, *supra,* § 128:

"Where, however the undertaking to provide a seaworthy ship is express, the express undertaking supersedes the implied undertaking, so far as it extends, and a limitation on claims will be effective to cut down that express undertaking."

See also, Carver, supra, §§ 356, 357; and the discussion in Aaby, supra. Thus, the clause limiting the amount of damages remains in effect when the express warranty is breached.

## C. The Implied Warranty of Seaworthiness

The absolute warranty of seaworthiness at one time implied by the courts into every contract of carriage of goods by sea has been fully discussed above. Just as parties to a bill of lading were once entitled to reduce their obligations in this regard, within certain limits, so now are parties to other contracts of carriage by sea. They can do so by the simple expedient of incorporating the terms of Cogsa, which apply of their own force to bills of lading, into their contract. There can be no public policy objection to this. Gilmore and Black, supra, at p. 183.

As discussed above, Cogsa both reduces the implied warranty of seaworthiness to an obligation to exercise due diligence to provide a seaworthy vessel, and limits the amount of liability for breach of this warranty to $500 per package unless the parties agree that it shall be greater. Thus, by incorporating the provisions of Cogsa into the bill of lading and thereby into the Agreement, the parties to the Agreement effectively reduced their implied warranty of seaworthiness to an obligation to exercise due diligence. See Nichimen, supra; In Re Marine Sulphur Queen, 460 F.2d 89, 103 (2d Cir. 1972), cert. den., 409 U.S. 982, 93 S.Ct. 318, 326, 34 L.Ed.2d 246 (1973); see also, Gilmore and Black, supra, § 4–5 n. 41, at 182.

■■■ Even if breach of either warranty were potentially to nullify the contract, the fact remains that Iligan did not treat the contract as void, but continued to ship goods under its terms. In so doing, Iligan did not waive its right to collect damages for the losses incurred as a result of the breach, see Carver, §§ 103, 104. But the right to treat an entire contract as null for failure of condition which, assuming ar-

guendo it existed, Iligan did not elect, is not the right to nullify selected terms of the contract. This, in effect, is what Iligan now attempts.

■■■ New York Navigation clearly breached its express warranty to furnish "seaworthy vessels". For this breach it is liable to Iligan in the amount of $500 per package. Equally clearly, New York Navigation did not breach its implied warranty to exercise due diligence to furnish a seaworthy vessel. There has been no showing that New York Navigation had any knowledge of a problem with the bilges, or was under any obligation to inspect the ship. To the contrary, the charterer was entitled to rely on Weyerhaeuser's warranty to it concerning the seaworthiness of the ship.

The damages here, for breach of the express warranty, are limited to the amount stipulated in the bill of lading and effectively incorporated in the Agreement.

### New York Navigation against Weyerhaeuser

■■ The time charter between Weyerhaeuser as shipowner and New York Navigation as charterer included both an express warranty by the owner to furnish a vessel, "tight, staunch, strong, and in every way fitted for service" and a general incorporation of the provisions of Cogsa, together with a clause providing that nothing in the charter was to be construed to increase the owner's liability over that provided in Cogsa. The parties are agreed that breach of the shipowner's warranty entitles the charterer to indemnification for any resulting loss it suffers, including reasonable attorney's fees, under the applicable case law. See Demsey & Associates v. S.S. Sea Star, 461 F.2d 1009 (2d Cir. 1972); Nichimen, supra; United States v. S.S. Wabash, 331 F.Supp. 145 (S.D.N.Y. 1971). It is also clear that the charterer is entitled to the award of fees incurred in defending against a charge of breach of such warranty, even if it is

ultimately exonerated. Guarracino v. Luckenbach Steamship Company, 333 F. 2d 646, 648 (2d Cir. 1964). What the parties dispute here is the scope of the shipowner's warranty to the charterer, compared with that of the charterer to Iligan.

Weyerhaeuser claims first that its warranty was to exercise due diligence, because of the clause stating that nothing in the contract was to increase its liability over the standards of Cogsa. It then argues that if New York Navigation expressly or impliedly absolutely warranted the seaworthiness of the vessel to Iligan, the shipowner cannot be held for resulting losses.

■ The same principles of construction governing the Agreement also apply to the charter party. The express absolute warranty of seaworthiness in the former supersedes the implied warranty of seaworthiness, so far as it extends, that is, until the time of delivery of the ship to the charterer. (Here, there was also a continuing obligation to maintain the ship in a seaworthy condition.) The warranty of seaworthiness at the time of sailing, implied by law in every contract of carriage, is reduced by the incorporation of the Cogsa provisions to an obligation to exercise due diligence. The clause stating that nothing is to be construed to increase the owner's liability beyond this therefore does not abrogate the specific, express language warranting the seaworthiness of the vessel at the time of delivery. Liability on these warranties is limited in amount to $500 per package. Thus, Weyerhaeuser's warranties to New York Navigation trace those of the latter to Iligan, except that the express warranty of seaworthiness in the charter party is more specific and comprehensive than that in the Agreement.

■ In view of these facts, Weyerhaeuser must indemnify the charterer for losses resulting from the unseaworthiness of the vessel, and from its lack of due diligence in providing a seaworthy vessel. These losses include reasonable attorney's fees. It makes no difference that plaintiff claimed the full amount of the lost cargo from New York Navigation on a theory of contract construction which would have expanded the scope of the warranty in the Agreement beyond that in the charter party. As between New York Navigation and Weyerhaeuser, the language of the charter party employed the same warranties as the Agreement, and was meant specifically to protect the charterer from losses resulting from the unseaworthiness of the vessel. In this situation, where the shipowner defaulted in its obligation even to exercise due diligence, the charterer should recover.

In the event that Weyerhaeuser and New York Navigation are unable to agree on the amount of the attorney's fees, the Court will set the matter down for a hearing.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed. R.Civ.P.

Settle judgment on notice.